UNITED STATES of America, Plaintiff,

v.

CONSERVATION CHEMICAL COMPANY OF ILLINOIS, et al., Defendants.

Civ. No. H86–9.

United States District Court,
N.D. Indiana,
Hammond Division.

Nov. 6, 1989.

Andrew B. Baker, Asst. U.S. Atty., Hammond, Ind., F. Henry Habicht, II, Asst. Atty. Gen., Land & Natural Resources Div., Mark E. Grummer and William R. Sierks, Environmental Enforcement Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., and Mary L. Fulghum, Jonathan McPhee and Catherine Nichols, Asst. Regional Counsel, U.S. E.P.A., Region V, Chicago, Ill., for plaintiff.

Louis M. Rundio, Jr. and Stephen P. Krchma, McDermott, Will & Emery, Chicago, Ill., and David C. Jensen and Maureen Johns Grimmer, Eichhorn, Eichhorn & Link, Hammond, Ind., for defendants.

## ORDER

MOODY, District Judge.

This matter is before the court on United States' Motion for Partial Summary Judgment on the Issue of Liability Against Defendants Conservation Chemical Company of Illinois and Norman B. Hjersted, filed December 31, 1986. Defendants Conservation Chemical Company of Illinois ("CCCI") and Norman B. Hjersted ("Hjersted") responded on January 21, 1987, and plaintiff

United States filed its reply on February 9, 1987.

## Background

The United States filed this suit under Sections 3008(a) and (g) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(a) and 6928(g), alleging that numerous violations of RCRA occurred at a hazardous waste treatment, storage, and disposal facility in Gary, Indiana (the "Gary facility") operated by CCCI and Hjersted, CCCI's president and principal shareholder. Defendants have conducted waste treatment, storage, and disposal activities at the Gary Facility continuously since approximately 1970. The facility was in operation on November 18, 1980, when the RCRA regulations at issue in this case became effective. The Gary facility attained "interim status" under RCRA, which allowed defendants to continue operating, but also made them subject to certain RCRA regulations. Defendants continued their hazardous waste activities until mid–December, 1985, when they halted operations at the request of the Environmental Protection Agency.

In this action, the United States seeks a court order requiring defendants to close the Gary facility in accordance with the closure and post-closure requirements of RCRA and to comply with certain additional RCRA regulations. In addition, the United States seeks civil penalties for defendants' alleged failure to submit and implement adequate closure and post-closure plans, and for alleged violations of certain RCRA interim status regulations. The United States seeks, by the instant motion, to obtain a ruling on the issue of liability only, leaving the issue of remedies for later trial.

## Statutory and Regulatory Scheme

The court has already set out in great detail the statutory and regulatory scheme which governs this action. *See United States v. Conservation Chemical Co. of Illinois*, 660 F.Supp. 1236 (N.D.Ind.1987). Rather than repeat that entire explanation, the court will merely summarize it here.

Congress passed the Resource Conservation and Recovery Act, 42 U.S.C. § 6901–6991, in 1976. Section 3004(a) of RCRA, 42 U.S.C. § 6924(a), requires the Administrator (of the EPA) to "promulgate regulations establishing such performance standards, applicable to owners and operators of facilities for the treatment, storage, or disposal of hazardous wastes … as may be necessary to protect human health and the environment." RCRA § 3005(a), 42 U.S.C. § 6925(a), further requires the Administrator to promulgate regulations requiring owners or operators of existing hazardous waste treatment, storage, or disposal facilities to obtain a RCRA operating permit.

The regulatory scheme as promulgated provides for hazardous waste facilities in existence on the effective date of RCRA to file a Part A application giving certain minimal information about the facility. If the Part A application is found to be sufficient, the facility is granted "interim status" and is "treated as having been issued a permit." 42 U.S.C. § 6925(e); 40 C.F.R. § 270.70. During its period of interim status the facility must comply with operating standards set out at 40 C.F.R. Part 265.

Following its achievement of interim status, the facility must file a Part B application, providing much more detailed information than was required for the Part A application. Under the 1984 amendments to RCRA, a facility that had been granted interim status before November 8, 1984 will have that status terminated on November 9, 1985, should the facility fail to apply for a final determination regarding the issuance of a permit pursuant to 42 U.S.C. § 6925(c) (Part B application) before November 9, 1985, and to certify that it is in compliance with all applicable groundwater monitoring and financial responsibility requirements. 42 U.S.C. § 6925(e)(2) (as amended by P.L. No. 98–616, 98 Stat. 3221).

Section 3006 of RCRA, 42 U.S.C. § 6926, provides that a state may obtain federal authorization to administer the RCRA hazardous waste program in that state. On January 31, 1986, the U.S. EPA granted to the State of Indiana final authorization un-

der Section 3006(c) of RCRA to carry out the RCRA hazardous waste management program in Indiana. 51 Fed.Reg. 3953. The Indiana regulations are codified at 320 Indiana Administrative Code ("ICA") Article 4.1, and many are identical·to the corresponding federal regulations.

Under the Indiana regulatory scheme, the owner or operator of a hazardous waste facility must submit closure and post-closure plans as a part of the Part B permit application, 320 IAC 4.1–34–5(b)(13). In addition, the owner or operator must submit a current closure plan at least 180 days before the date closure is expected to begin, and must submit two copies of· the plan within fifteen days after the facility loses interim status. 320 IAC 4.1–21–3(c).

## Standard of Review

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions and affidavits "show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1031 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). The court must view the record and any reasonable inferences which may be drawn from it in the light most favorable to the non-moving party. *P.H. Glatfelter Co. v. Voith, Inc.,* 784 F.2d 770, 774 (7th Cir.1986). Furthermore, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## Findings of Fact

Defendant CCCI is a corporation organized under the laws of the State of Missouri and doing business in the State of Indiana. CCCI purchased the Gary facility, located at 6500 Industrial Highway, Gary, Indiana, in 1968. Since 1968, CCCI has owned and operated an industrial waste treatment, storage, and disposal facility at the Gary site.

Defendant Norman B. Hjersted, an individual, is the president, chairman of the board of directors, treasurer, and principal shareholder (owning more than 90% of the stock) of CCCI. He was an incorporator of CCCI, and has been its president since its incorporation in 1968. He has been on the board of directors since the date of incorporation as well. Hjersted received a salary for his work with CCCI, while officers who do not contribute to the day-to-day running of the company have not been paid a salary. Hjersted has a degree in chemical engineering, and has been in the industrial waste treatment business for over 27 years.

Hjersted considers himself to be the person in charge at the Gary facility and is responsible for environmental compliance there. His approval is required for major expenditures; plant managers must clear with him all expenditures in excess of approximately $750.00, except for the purchase of raw materials. He is a member of a group that he claims makes many of the management decisions, and he executes documents on behalf of the company as its president. Hjersted is familiar with and designed, either wholly or in large part, the treatment processes at the Gary facility whereby ferrous chloride is converted to ferric chloride.

Between 1968 and 1974, Hjersted was present at the Gary facility on between one half and two thirds of the working days. After moving his residence to Missouri in 1975, he visited the Gary facility every month. Beginning around late 1984 to 1985 his visits slowed to once every three months. He telephoned the plant manager of the Gary facility nearly every day, however, to discuss operations, production,

leaks, and other problems. He gave direct instructions at various times to move materials and wastes from one treatment or storage unit to another at the Gary facility.

The Gary facility, which is about four acres in size, has been used by CCCI to store, treat, and transport hazardous waste CCCI since November 19, 1980. One hazardous waste that CCCI has stored and treated at the Gary facility is spent pickle liquor.

CCCI submitted Part A of its RCRA hazardous waste permit application on November 18, 1980. Although ordered by the EPA to submit Part B of its permit application by June 20, 1984, CCCI submitted its Part B permit application on July 13, 1984. U.S. EPA notified CCCI of deficiencies in that Part B application by letter dated January 30, 1985. CCCI submitted a revised Part B permit application on May 14, 1985. Hjersted personally reviewed and signed Parts A and B of CCCI's permit applications. The closure plan submitted with each of the Part B permit applications was rejected as deficient, and CCCI did not resubmit two copies of its closure plan or modified closure plan to the State of Indiana or to U.S. EPA within fifteen days after November 8, 1985.

The revised Part B application indicates there is one surface impoundment at the Gary facility, which will be referred to as "Basin 19" in this order. While the parties dispute what materials were placed into Basin 19 it is undisputed that Basin 19 contained material that was, in one way or another, derived from spent pickle liquor.[1] CCCI's Part B permit application indicated that the material in Basin 19 was tested and found to have a pH of 1.8,[2] indicating a high level of acidity.

Theodore Warner, an environmental scientist with the Indiana State Board of Health, inspected the Gary facility on August 29, 1984 and on March 25 and 29, 1985. He observed the following violations:

a. Pursuant to 320 IAC [4.1–41–6(d)] (40 CFR 265.15(d)), the owner or operator shall record inspections in an inspection log. Based on my observations, CCCI has not recorded daily inspections of the areas subject to spills in an inspection log.

b. Pursuant to 320 IAC [4.1–18–3(e)] (40 CFR 265.52(e)), the contingency plan shall include a list of all equipment at the facility, location of equipment, physical description of each item on the list, and a brief outline of its capabilities. Based on my review of the plan, CCCI has not included a brief outline of the capabilities of all emergency equipment in the contingency plan.

c. Pursuant to 320 IAC [4.1–19–4(b)] (40 CFR 265.73(b)(1)), the operating record shall contain a description and the quantity of each hazardous waste received and the method(s) and date(s) of each waste's treatment, storage, or disposal at the facility as required by Appendix I of 40 CFR 265. Based on my review of the record, CCCI has not provided a description and the quantity of each hazardous waste received and the method(s) and date(s) of each waste's treatment, storage, or disposal at the facility as required by Appendix I in operating record.

d. Pursuant to 320 IAC [4.1–16–5(b)] (40 CFR 265.14(b)), security measures shall include 24–hour surveillance or an artificial or natural barrier around the facility with a means

1. The United States asserts at least some of the material was spent pickle liquor, while defendants claim it was processed waste water from manufacturing operations and pickle liquor which was chemically treated or neutralized.

2. Defendants submitted an affidavit sworn to by Hjersted repudiating the report of a 1.8 pH in Basin 19. Hjersted claimed a metal tank left in Basin 19 for several years did not show signs of significant deterioration as it would have if the tank had been immersed in an acid bath of 1.8 pH for that period of time. As noted on pages 1225–1226 of this order, *infra,* however, circumstantial evidence that the material in Basin 19 may not have been highly acidic for years on end does not controvert the claim that, for at least a limited period of time, the material in Basic 19 did have a pH of 1.8.

to control entry. Based on my observations, CCCI has not provided security measures which include 24-hour surveillance or an artificial or natural barrier around the facility with a means to control entry. There is no controlled entry at the facility and the fence is in bad repair.

e. Pursuant to 320 IAC [4.1–17(2)] (40 CFR 265.31), the owner or operator shall manage hazardous wastes to prevent fire, explosion, or release of hazardous waste or hazardous waste constituents on premises which could threaten human health or the environment. Based on my observations, there is evidence of the release of hazardous waste or hazardous waste constituents on premises which could threaten human health or the environment. This release occurred when the surface impoundments were allowed to overflow.

f. Pursuant to IC 13–7–4–1(c), no person shall deposit any contaminants upon the land in such place and manner which creates, or which would create a pollution hazard. Based on my observations, CCCI has deposited contaminants upon the land. This deposition is a result of the overflow of the surface impoundment, and the spillage from tank number 19 which is leaking, and the spillage which has occurred in the general operating area.

g. Pursuant to 320 IAC [4.1–15–7(b) and (j)] (40 CFR 265.56(b) and (j)), whenever there is a release of hazardous waste, the emergency coordinator must immediately identify the character, exact source, amount, and the real extent of any released materials. Based on my observations, CCCI has not identified the spilled material at the facility.

h. Pursuant to 320 IAC [4.1–25–2,–3] (40 CFR 265.222), a minimum of 60 cm. (two feet) of freeboard shall be maintained in the surface impoundment. Based on my observations, CCCI has not maintained a minimum of 60 cm. (two feet) of freeboard in the hazardous waste surface impoundment.

i. Pursuant to 320 IAC [4.1–25–4] (40 CFR 265.223), earthen dikes shall have a protective cover. Based on my observations, CCCI has not provided a protective cover for earthen dikes at the surface impoundments.

j. Pursuant to 320 IAC [4.1–20–1 through 20–5] (40 CFR 265.90 [through 265.94]), the owner or operator of a surface impoundment which is used to manage hazardous waste must implement a groundwater monitoring program capable of determining the facility's impact on the qualify of groundwater in the uppermost aquifer underlying the facility. Based on my observations, CCCI has not implemented a groundwater monitoring program for the surface impoundments.

Many of the tanks on the facility were leaking and there is overall evidence of substantial spills or releases of tank and surface impoundment contents onto the ground both on and off the facility.

Furthermore, defendants admit the Gary facility does not have a RCRA groundwater monitoring system, nor has it certified compliance with the RCRA groundwater monitoring and financial assurance requirements as of November 8, 1985.

### Discussion

#### Elements of Liability

The United States sets out (and defendants do not dispute) that the following elements must be proved for liability to attach under Section 3008(a) of RCRA, 42 U.S.C. § 6928(a):

1. That the defendants are "persons" as defined in Section 1004(15) of RCRA, 42 U.S.C. § 6903(15);

2. that the defendants are "operators" of the Gary Facility within the meaning of 320 IAC 4.1–1–7;

3. that the Gary facility is a hazardous waste treatment, storage, or disposal

facility which is subject to RCRA; and

4. that the defendants failed to comply with RCRA requirements applicable to operators of the Gary facility.

Of the above elements, there is no dispute that both Hjersted and CCCI are "persons" as defined in Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).[3] There is also no dispute that CCCI is an "operator" of the Gary facility.[4] Finally, there is no dispute that the Gary facility is a hazardous waste treatment, storage, or disposal facility which is subject to RCRA.[5] The parties do dispute, however, whether defendant Hjersted may be personally liable under RCRA as an "operator" or otherwise; the applicability of certain RCRA-inspired regulations to the facility; and whether any violations occurred regarding the applicable requirements.

The issues to be resolved with respect to this motion, then, are (1) whether defendant Hjersted is an "operator" of the Gary facility as defined in 320 IAC 4.1-1-7 (or whether he may be liable under RCRA even if he is not an operator); (2) what regulations are applicable to the Gary facility; and (3) whether the applicable regulations were violated.

(1) Defendant Hjersted's Liability

The United States argues that defendant Hjersted, as president, chairman, treasurer, principal shareholder, and person in authority at CCCI, should be held personally liable for such violations of RCRA as may be proved in this case. Defendants argue in response that Hjersted may not be held personally liable unless he is an "operator" of the Gary facility as that term is defined in 320 IAC 4.1-1-7. Because "operator" is defined in that regulation as "*the* person responsible for the overall operation of a facility," (emphasis added), defendants claim that there can be only one operator of a facility, and that CCCI, not Hjersted, is the operator of the Gary facility.

■ The court notes first that it has already found that Hjersted, as a corporate officer of CCCI, may be held liable under RCRA regardless of whether he himself qualifies as an "operator," as long as he was actively involved in the alleged violative activity. *See United States v. Conservation Chemical Co. of Illinois*, 660 F.Supp. 1236, 12 (N.D.Ind.1987); *accord United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 745 (8th Cir.1986) ("[i]mposing liability upon only the corporation, but not those corporate officers and employees who actually make corporate decisions, would be inconsistent with Congress' intent to impose liability upon the persons who are involved in the handling and disposal of hazardous substances.")

■ As for potential liability as an "operator" of the Gary facility, a recent decision issuing from this district has established that a hazardous waste facility may indeed have more than one operator for RCRA purposes, despite the apparent limitations of the definitional language.[6] *United States v. Environmental Waste Control, Inc.*, 698 F.Supp. 1422, 1429 (N.D. Ind.1988). According to Judge Miller's decision in *Environmental Waste Control*, operator liability may be imposed pursuant

---

3. Person is defined as "an *individual,* trust, firm, joint stock company, *corporation* (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 6903(15) (emphasis added).

4. "Operator" is defined as "the person responsible for the overall operation of a facility." 320 IAC 4.1-1-7. Defendants concede in their response to the instant motion for partial summary judgment that "it is clear that the company [CCCI] is *the* person responsible for the facility's operation." Defendant's response, Jan. 21, 1987 at 17 (emphasis in original).

5. The parties have stipulated that CCCI has treated and stored hazardous waste at the Gary facility, and defendants did not attempt to argue otherwise in their response to the instant motion.

6. The court does not deem it important that Judge Miller cited to the definition of "operator" found in the federal regulations, 40 C.F.R. § 260.10, while the parties in this case have looked to the Indiana regulations, 320 1 AC 4.1-1-7. The two definitions are identical.

to § 3008(g) of RCRA, 42 U.S.C. § 6928, on actively-involved responsible corporate officials as well as on the corporation itself. *Id.* This finding is consistent with other courts' interpretations of Congress' general statutory scheme for liability in the regulation of hazardous wastes. *See e.g., United States v. Northeastern Pharmaceutical & Chemical Co., supra* (applying to RCRA § 7003(a), 42 U.S.C. 6973(a)); *United States v. Conservation Chemical Co.,* 628 F.Supp. 391 (W.D.Mo.1985) (applying to CERCLA § 107(a), 42 U.S.C. § 9607(a)). The court concludes, consistent with the above-cited cases, that both Hjersted and CCCI may be liable under RCRA as operators of the Gary facility.

In considering whether the government has established that Hjersted is in fact liable as an operator of the Gary facility, or as a corporate official actively involved in RCRA violative activity, the court looks to the uncontroverted facts that Hjersted is the president, chairman of the board, treasurer, and principal shareholder of CCCI (owning more than 90% of the outstanding stock); that the only other officers or directors—Attorney Denver Vold and Hjersted's son, Lawrence Hjersted—play a significantly smaller role in running the corporation than Hjersted does; that Hjersted designed, either wholly or in large part, the treatment processes for the conversion of ferrous chloride to ferric chloride at the Gary facility; that Hjersted visited the facility on between one-half and two-thirds of the working days until he moved to Missouri in 1975, after which he visited the facility on a monthly basis and later on a tri-monthly basis; that even after he moved away, Hjersted talked to the plant manager nearly every day on the telephone discussing any leaks or spills that occurred, as well as other aspects of the facility's operation and production; and that Hjersted was concededly responsible for environmental compliance at the Gary facility.

Although Hjersted asserts by affidavit that CCCI was managed by a group or committee which operated by consensus, and that many decisions were made directly by plant managers rather than by himself, these facts do not controvert the fact that Hjersted was actively involved in the operations of the Gary facility and that he was ultimately responsible for environmental compliance there. Taken in conjunction with his status as corporate officer and director and his overwhelming control of the outstanding stock, the court believes it supplies a sufficient basis for finding that Hjersted is personally liable for such of the alleged violations as may be proved in this case, whether as an actively-involved corporate official or as an operator of the Gary facility.[7]

### (2) Applicability of RCRA Regulations

Defendants challenge the applicability of certain RCRA regulations to the Gary Facility on two grounds: (a) No material (hazardous or otherwise) was placed into two of the four basins at the Gary facility after the effective date of the hazardous waste regulations, so those regulations do not apply to those two basins; and (b) most, if not all, of the regulations which were allegedly violated apply only if the Gary facility contains a "land disposal unit" and defendants deny that any of the basins at CCCI's Gary facility are land disposal units.

### (a) *Application of RCRA* to Pre–RCRA Activities

The court notes first that plaintiff United States has limited its motion for partial summary judgment on the issue of land disposal units (basins into which hazardous wastes have been placed) to a single basin—Basin 19. This is not one of the basins defendants claim has received no material after the effective date of the regulations. Because defendants' argument goes only to basins not addressed by the United

---

**7.** The court notes that Hjersted would not be liable as an actively-involved corporate official for isolated occurrences done without his knowledge and contrary to company policy. None of the alleged violations are of that sort, however. All involve overt acts or omissions within his range of knowledge and responsibility, such as failure to file an acceptable closure plan, failure to keep certain records, or failure to provide cover or earthen dikes or sufficient freeboard around land impoundments.

States, it would seem to be irrelevant to the instant motion. However, because the issue will ultimately need to be resolved whether the instant motion is granted or denied, the court will address it at this time.

■ It is well-established that much of RCRA authorizes only prospective relief. *Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49, 108 S.Ct. 376, 381 n. 2, 98 L.Ed.2d 306 (1987); *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726 (8th Cir.1986); *Lutz v. Chromatex, Inc.*, 718 F.Supp. 413, 424 (M.D.Pa.1989). Even where only prospective application of the statute is contemplated, however, current or continuing violations may be addressed despite the fact that they may have originated in activities occurring before the effective date of the statute. *See e.g., United States v. Northeastern Pharmaceutical & Chemical Co., supra, United States v. Price*, 523 F.Supp. 1055 (D.N.J. 1981). Thus, although the actual disposal of hazardous waste into a land disposal unit is not a violation of RCRA if the disposal occurred before the material was established by regulation to be a hazardous waste, *see Chemical Waste Management, Inc. v. U.S. EPA*, 869 F.2d 1526, 1531 (D.C. Cir.1989), the current storage of that hazardous waste in the land disposal unit may subject the owner or operator of the facility to RCRA liability if the storage is carried out in violation of one or more of the RCRA regulations. *See generally United States v. Price*, 523 F.Supp. at 1069–74; *see also United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d at 741–42. Even if material is not listed as hazardous at the time it is placed into a storage unit, "[h]azardous waste listings are retroactive, so that once a particular waste is listed, all wastes meeting that description are hazardous wastes no matter when disposed." *Chemical Waste Management, Inc. v. U.S. EPA*, 869 F.2d at 1530–31 (quoting 53 Fed.Reg. 31, 147 (Aug. 17, 1988)).

In sum, the fact that no material was placed in certain basins after the effective date of the applicable regulations does not, in itself, absolve defendants of liability with respect to those basins if the basins, after that effective date, still contained hazardous wastes placed there previously. Whether liability exists regarding the two basins at issue, or whether any potential relief order may encompass those two basins, of course, must await further proceedings.

(b) *Land Disposal Units or Facility*

Although RCRA does not define "land disposal facility", Section 3004(k) of RCRA, 42 U.S.C. § 6924(k) defines the term "land disposal" to include "any placement of such hazardous waste in a landfill, *surface impoundment*, waste pile,...." (emphasis added). Thus, a facility that contains a surface impoundment used for disposal, treatment, or storage of hazardous wastes is a "land disposal facility" within the meaning of Section 3005(e)(2) of RCRA, 42 U.S.C. § 6925(e)(2). *See United States v. T & S Brass and Bronze Works, Inc.*, 681 F.Supp. 314, 320 (D.S.C.1988).

CCCI's Part A permit application and Part B permit application both indicate that there is a surface impoundment at the Gary Facility. Although there are four basins at the Gary facility over which the parties have been in dispute at various times during the course of this litigation, the United States has concentrated on the Basin 19 area for purposes of this summary judgment motion.

■ The government asserts that spent pickle liquor, a "listed"[8] hazardous waste, was placed in Basin 19, thereby qualifying Basin 19 as a land disposal unit under RCRA section 3004(k), 42 U.S.C. § 6924(k). Defendants argue in response that the Indiana Hazardous Waste rules exclude pickle liquor which is recycled for use in water treatment facilities, and CCCI reused the pickle liquor it purchased to produce waste water treatment products. Defen-

---

**8.** A "listed" hazardous waste is a waste included on the list found in 320 IAC 4.1–6–3, 40 C.F.R. § 261.32.

dants are apparently basing their argument on 320 IAC 4.1-6(a)(1)(i) (40 C.F.R. § 261.6(a)(3)(i)), which exempts from much of the hazardous waste regulatory scheme "a spent pickle liquor which is reused in wastewater treatment at a facility holding a National Pollutant Discharge Elimination System (NPDES) permit, or is being accumulated, stored, or physically, chemically, or biologically treated before such reuse." Nowhere do defendants so much as allege, much less support with affidavits or other documentation, that either CCCI or any facility which purchased the recycled spent pickle liquor from CCCI for wastewater treatment purposes held a NPDES permit. Furthermore, 320 IAC 4.1-3-6(a)(1)(i) on its face covers only the spent pickle liquor which is or will be reused for wastewater treatment. It does not expressly extend to cover either spills that are not reused or waste generated by the treatments of the pickle liquor, such as the material allegedly disposed of in Basin 19. Accordingly, the court finds that 320 IAC 4.1-3-6(a)(1)(i) (40 C.F.R. § 261.6(a)(3)(i)) is inapplicable to the material in Basin 19 in this case.

Defendants offer three more interrelated arguments in response to the United States' assertion that Basin 19 is a land disposal unit: (1) the material put into Basin 19 was not pickle liquor or hazardous waste at all, but rather was a non-hazardous product that had been made from, or was a byproduct of, chemically treated or neutralized pickle liquor; (2) even if some of the material could be considered waste, it was not "listed" waste, but "characteristic" waste, which is no longer classified as hazardous waste once it has been treated (as the material in basin 19 purportedly was) so that the characteristic is no longer exhibited; and (3) a statement in one of CCCI's permit applications characterizing the liquid in Basin 19 as hazardous due to a low pH was apparently incorrect. (Defendants assert a metal tank which has been stored in Basin 19 "for several years" has not been corroded away like it would have been had the pH indeed been 1.8 as the permit stated.)

■ Although defendants dispute that actual pickle liquor was placed in Basin 19, there is no dispute that whatever the material was, it was derived in some way from spent pickle liquor. Spent pickle liquor is defined as a hazardous waste because it is found in the list of hazardous wastes in both federal and State of Indiana regulations. *See* 40 C.F.R. § 261.30(a); § 261.32, Haz. Waste No. K062; 320 IAC 4.1-6-1(a); 4.1-6-3, Haz. Waste No. K062. According to the regulatory scheme, "hazardous waste will remain a hazardous waste." 320 IAC 4.1-3-3(c)(i). Paragraph (d)(2) of 320 IAC 4.1-3-3 allows an exception to paragraph (c) *if* "[i]n the case of a waste which is a listed waste in 320 IAC 4.1-6, contains a waste listed in 320 IAC 4.1-6, or is derived from a waste listed in 320 IAC 4.1-6, it also has been excluded from paragraph (c) pursuant to 320 IAC 4.1-1." Thus, a "listed" hazardous waste, as well as anything derived from a "listed" hazardous waste, remains hazardous unless it is exempted pursuant to 320 IAC 4.1-1.

320 IAC 4.1-1 provides for petitions for delisting pursuant to 40 C.F.R. §§ 260-20 and 260.22. *See* 320 IAC 4.1-1-4. Under 40 C.F.R. §§ 260.20 and 260.22, the party seeking to have any particular material "delisted"—*i.e.*, exempted from hazardous waste regulation at a particular facility— must file a petition requesting such action. No such petition was filed by CCCI for the Gary facility. Thus, any material derived from spent pickle liquor at that facility is still classified as hazardous according to the regulatory scheme.

■ Defendants argue, however, that the material placed in Basin 19 was not a "listed" hazardous waste at all, but only a "characteristic" waste, and as such, is only hazardous if it exhibits one or more characteristics of hazardous waste: ignitabiity, corrosivity, reactivity, or EP toxicity. *See* 320 IAC 4.1-5-1 *et seq.;* 40 C.F.R. § 261.20 *et seq.* It appears defendants base their claim that the material was a "characteristic" waste on 320 IAC 4.4-3-3(c) which provides in pertinent part:

(ii) The following solid wastes are not hazardous even though they are generat-

ed from the treatment, storage, or disposal of a hazardous waste, unless they exhibit one or more of the characteristics of hazardous waste: (A) Waste pickle liquor sludge generated by lime stabilization of spent pickle liquor from the iron and steel industry.

320 IAC 4.4–3–3(C)(2)(ii); 40 C.F.R. § 261.3(b)(2)(ii). Defendants assert this exemption applies to the material placed in Basin 19 because that material is derived from the lime stabilization treatment of spent pickle liquor purchased from the iron and steel industry.

Although the language of the regulation itself is ambiguous the entry in the Federal Register beginning at 49 Fed.Reg. 23284 makes it abundantly clear that 40 C.F.R. § 261.3(b)(2)(ii), from which the Indiana regulation was copied verbatim, applies only to *sludge* generated within the iron and steel industry itself, not to sludge generated at other treatment facilities from pickle liquor which came from the iron and steel industry.[9] Because CCCI is not an iron or steel producing or processing facility, 320 IAC 4.1–3–3(c)(2)(ii) (and the parallel 40 C.F.R. § 261.3(b)(2)(ii)) does not apply to reclassify any sludge generated at its facility from "listed" waste to "characteristic" waste.

In sum, the court concludes that the material placed in Basin 19 was "listed" waste, not "characteristic" waste, and thus was classified as hazardous because it was never "delisted."

■ However, even if the court were to conclude the waste in Basin 19 was indeed "characteristic"—*i.e.*, was not hazardous unless it displayed one of the characteristics of hazardous waste—the court finds that at least one characteristic was demonstrated to be present at one time in Basin 19. According to CCCI's own Part B permit application, which was indisputably reviewed and signed by Hjersted on behalf of CCCI, the pH in Basin 19 was tested and found to be 1.8. The relevant regulations provide that an aqueous solid waste exhibits the characteristic of corrosivity if it is properly tested and found to have a pH less than or equal to 2. 320 IAC 4.1–5–3(a)(1); 40 C.F.R. § 261.22(a)(1). Thus, the material in Basin 19 was demonstrated on at least one occasion to have met the requirement for being hazardous, even if classified as "characteristic" waste.

Defendants counter with a repudiation of the Part B permit application, stating that the 1.8 pH must not be accurate since a metal tank left in Basin 19 for several years did not show significant deterioration as it would have if it had been immersed for that period of time in a liquid having a 1.8 pH. The fact that circumstantial evidence may show the pH could not have been consistently low over a period of years, however, does not controvert the fact that on at least one occasion, the pH *was* that low. If other non-acidic materials were later placed into the basin, diluting the acid and raising the pH to non-corrosive levels, that does not change the fact that for at least a time Basin 19 contained corrosive characteristic waste—hazardous waste—bringing it within the definition of land disposal facility.

In conclusion, the undisputed facts, however they are characterized, establish that Basin 19 contained material classified as hazardous under 320 IAC 4.1–3–3; 40 C.F.R. § 261.3. CCCI's Gary Facility was therefore a land disposal facility, bringing it within the coverage of the RCRA regula-

---

9. "As stated earlier, [lime stabilized waste pickle liquor sludge ("LSWPLS")] is also generated by industries other than the iron and steel industry (e.g., engraving, fabricated metal products, household appliance, *commercial treatment facilities*, and others). Although the [Environmental Protection] Agency has determined that treatment of spent pickle liquor from the iron and steel industry is typically effective, this may not be the case for LSWPLS generated from other industry categories.

The Agency lacks comprehensive, industry-wide data on these other sludges and also does not have data on whether wastes with interfering properties might be commingled with these sludges. The iron and steel industry likewise has clarified that its petition has no applicability for LSWPLS generated by plants outside the iron and steel industry. Thus, the Agency will continue to proceed delisting petitions for LSWPLS that is generated in industries other than iron and steel on an individual basis" 40 Fed.Reg. 23284 (emphasis added).

tions governing such land disposal facilities.

### (3) RCRA Violations

The United States asserts two separate types of violations occurred at CCCI's Gary facility: failure to file "acceptable" closure plans in a timely fashion as required by 320 IAC 4.1–21–3(c), and failure to fulfill numerous specific interim status requirements. In response, defendants argue that there is no regulatory requirement that closure plans be "acceptable" when submitted, and that most of the allegedly-violated interim status requirements are inapplicable because they apply only to land disposal units, of which there are none at CCCI's Gary facility.

### (a) *Closure Plans*

The United States points out that defendants have stipulated that the Gary facility has been subject to the RCRA "interim status" regulations since November 19, 1980, a fact which defendants do not dispute. The interim status regulations require that the owner or operator of a hazardous waste facility submit closure and post-closure plans to the Technical Secretary at least 180 days before the date closure is expected to begin, and no later than fifteen days after termination of interim status. 320 IAC 4.1–21–3(c); *see also generally* 320 IAC 4.1–21–1 *et seq*. Plaintiff United States argues that defendants never submitted "proper" or "acceptable" closure or post-closure plans, either with their Part B permit application or within fifteen days after purportedly losing interim status. Defendants respond that they did submit plans with the Part B permit application, and that although those plans were found to be deficient, the regulations do not impose any requirement that the plans be "acceptable" at the time they are first submitted.

#### (i) "Acceptability" Requirement

■ The court notes that the general requirements for the contents of the "fi-

nal" (*i.e.*—Part B) permit application mandate only that "[a] copy of the closure plan and where applicable, the post-closure plan required by 320 IAC 4.1–46–3 and 320 IAC 4.1–49–5" be included with the application. 320 IAC 4.1–34–5(13). The words "proper" and "acceptable" do not appear in the regulation. Furthermore, as defendants point out, 320 IAC 4.1–21–3(d) provides that "[t]he Technical Secretary will approve, modify, or disapprove the plan within 90 days of its receipt. If the Technical Secretary does not approve the plan, the owner or operator must modify the plan or submit a new plan for approval within 30 days." [10] In other words, the regulations contemplate the possibility that closure plans may not be perfect or "acceptable" when first submitted, and provide a procedure for curing any deficiencies that may exist in those plans.

The fact that the words "proper" or "acceptable" or their equivalent do not appear in the regulations, combined with the existence of a regulatory scheme for the curing of any deficiencies in the closure plans as originally submitted, suggest that an initial failure to submit an "acceptable" closure plan is not necessarily a per se violation of the RCRA-inspired regulations. On the other hand, if there is *no standard of acceptability* implied by the scheme at all, it would provide a gaping loophole through which recalcitrant violators could bypass the regulations with impunity. By filing nothing but grossly deficient closure plans, violators could stave off closure, as well as enforcement proceedings indefinitely, or at least escape any civil penalties, solely because closure plans were filed, however deficient those plans may be.

The court believes neither extreme—total lack of an acceptability requirement or a strict requirement of acceptability on first submission—is appropriate. The court hesitates to find a defendant subject to liability under RCRA if an initial closure plan fails to meet all criteria but is in substantial compliance with most of the regula-

---

**10.** The Code of Federal Regulations contains passage setting out the same timetable and pro-

cedure. *See* 40 C.F.R. § 265.112(d)(4).

tions, especially if the deficiencies, once pointed out, are largely cured in a second timely submission pursuant to 320 IAC 4.1–21–3(d). On the other hand, the court believes a defendant who submits a plan that is so grossly deficient as to be virtually uncorrectable, and who fails at least substantially to cure the deficiencies in a second plan submitted under 320 IAC 4.1–21–3(d), should properly be subject to liability in a RCRA enforcement proceeding. While the court hesitates to create a bright line test out of whole cloth, the court believes the regulatory scheme set out in 320 IAC 4.1–21–3(d) provides sufficient guidance to approximate a standard for which liability should attach. 320 IAC 4.1–21–3(d) permits the owner or operator of a hazardous waste facility two chances to submit "acceptable" closure plans, and allows the Technical Secretary to modify the second plan before it is finally accepted. It would follow that a closure plan which has not reached the point of being acceptable by its second submission, even with such modifications as the Technical Secretary is able to supply, should be considered violative of the RCRA regulatory scheme. Of course, failure to submit a plan at all by a mandatory deadline is clearly a violation.

### (ii) Whether Defendants Violated the "Acceptable" Closure Plan Requirement

■ It is undisputed that CCCI was ordered to submit Part B of its RCRA permit application no later than June 20, 1984, and that CCCI, in fact, submitted its Part B application on July 13, 1984. CCCI was notified of the deficiencies in the application by a letter dated January 30, 1985. The deficiencies included:

> Incomplete and inadequate closure plan with respect to (1) the container storage areas, (2) the tanks, discharge control equipment, and discharge confinement structures, and (3) the waste piles, surface impoundments, and proposed incinerator. Inadequate post-closure plan for the waste pile and surface impoundments.

CCCI submitted a revised Part B permit application on May 14, 1985, which the United States asserts was deficient as well. The United States points to the transcript of an EPA environmental protection specialist's testimony at the preliminary injunction hearing in this case to demonstrate some of the deficiencies in the second closure plan.[11] According to the specialist, Sally K. Swanson, the sampling and analysis in CCCI's plan was insufficient to determine the extent of contamination at the Gary facility or the quantity of contaminated material that should be removed; the proposal for decontaminating storage tanks did not appear to be adequate; the plan was vague as to precisely what wastes were to be decontaminated, removed, or required closure; it did not address a "worst case situation"; it only partially addressed two alleged surface impoundments—the pie basin and basin 19—and it did not address at all the area around tank 20 or the off-site basin, which the EPA asserts are both surface impoundments requiring closure.

The file in this case also contains a copy of the Indiana Department of Environmental Management's second completeness and preliminary technical review of a closure plan submitted by CCCI on May 23, 1986. *See Supplemental Memorandum of the United States concerning Defendant's second Motion to Dismiss*, filed February 11, 1987. This document lists some fifty specific deficiencies, 35 of which are found under the heading of "closure plans." Although some of the deficiencies listed are clearly *de minimis* (*see e.g.*, # 25 "This subsection should be separate from the tank storage section or the section should be retitled."), other deficiencies are just as clearly basic and major. (*See, e.g.* # 29 "CCCI proposes to use fill material for the clay cap that has a minimum particle size of three inches. This is grossly inappropriate for a cap designed to keep water from infiltrating into the surface impoundments."). Although this document was

---

11. The United States also refers to an exhibit presented at that hearing, but provides no copy of that exhibit with the instant motion. The exhibit itself was released to the United States on September 3, 1987, pursuant to its request.

dated eight days after defendants submitted their response to the instant motion for summary judgment, thus giving defendants no opportunity to controvert the facts cited in the document, the court notes that defendants never argued that their closure plans were in fact "proper" or "acceptable" in the first place, and never attempted to controvert the deficiencies set out by the United States in its original motion for summary judgment and supporting documentation. Defendants' sole argument against liability on the issue of its failure to submit an "acceptable" closure plan was its argument that the regulations do not impose even an implied acceptability requirement in the first place, an argument which this court rejects.

In sum, because the court finds there is an implied requirement that a closure plan be substantially acceptable once it has been reviewed, rejected, and resubmitted, and because defendants have not controverted the United States' submissions establishing that CCCI has failed, after at least two tries, to submit a closure plan that is even close to being acceptable, the court finds defendants liable for failing to submit a substantially acceptable closure plan in a timely fashion.

Defendants also challenge the closure plan violations allegation that no "acceptable" closure plan was submitted within fifteen days of its loss of interim status as required by 320 IAC 4.1–21–3(C) on the ground that section 3005(e)(2) of RCRA, 42 U.S.C. § 6925(e)(2)—the statute which the United States asserts deprived CCCI of its interim status on November 8, 1985—only applies to land disposal facilities, and no land disposal units are present at CCCI's Gary facility. As noted above, however, the court found that there was indeed at least one land disposal unit at the Gary Facility.

In order to maintain interim status, CCCI was required to submit to the EPA a statement certifying compliance with RCRA groundwater monitoring and financial responsibility requirements at the Gary land disposal facility, see Section 3005(e)(2) of RCRA, 42 U.S.C. § 6925(e)(2), and defendant concede that "if there is a land disposal unit at [the Gary] facility, as of November 8, 1985 [CCCI] could not make the necessary certifications and consequently lost interim status." Defendants Response to Motion for Partial Summary Judgment at 8 (Jan. 21, 1987).

The court, thus, concludes that CCCI's Gary facility did indeed lose interim status on November 8, 1985.

■■■■ It is undisputed that defendants did not resubmit either an original or modified closure plan within fifteen days of loss of interim status as required by 320 IAC 4.1–21–3(c)(1). The fact that defendants had already submitted one closure plan on July 13, 1984, and a second modified plan on May 14, 1983, does not fulfill the requirements of 320 IAC 4.1–21–3(c)(1), since that regulation makes it plain that a submission after loss of interim status is a different submission from that required 180 days before closure with the Part B permit application.[12] For instance, two copies of the plan must be submitted within fifteen days of loss of interim status, while only one is required otherwise. See 320 IAC 4.1–21–3(c)(1).

Thus, even outside of the issue of whether an "acceptable" closure plan is required, the court finds defendants violated 320 IAC 4.1–21–3(c)(1) by their admitted failure to file two copies of their closure plan within fifteen days of CCCI's loss of interim status on November 8, 1985.

**(b)** *Interim Status Violations*

■■■■ In addition to the closure plan violation, the United States asserts that defen-

---

**12.** 320 IAC 4.1–21–3(c)(1) provides in pertinent part:

(c) The owner or operator must submit his closure plan to the Technical Secretary at least 180 days before the date he expects to begin closure. The owner or operator must submit two (2) copies of his closure plan to the Technical Secretary no later than 15 days after:

(1) termination of Interim Status (except when a final permit is issued to the facility simultaneously with termination of this Interim Permit).

dants violated a number of interim status regulations, thus incurring liability under Section 3008(a) of RCRA, 42 U.S.C. § 6928(a). Specifically, the United States offers the affidavit of Ted F. Warner, an environmental scientist employed by the Compliance Monitoring Section, Division of Land Pollution Control, Indiana State Board of Health, who stated that he inspected CCCI's Gary facility on March 25, 1985, and observed the following violations:

a. Pursuant to 320 IAC [4.1–41–6(d)] (40 CFR 265.15(d)), the owner or operator shall record inspections in an inspection log. Based on my observations, CCCI has not recorded daily inspections of the areas subject to spills in an inspection log.

b. Pursuant to 320 IAC [4.1–18–3(e)] (40 CFR 265.52(e)), the contingency plan shall include a list of all equipment at the facility, location of equipment, physical description of each item on the list, and a brief outline of its capabilities. Based on my review of the plan, CCCI has not included a brief outline of the capabilities of all emergency equipment in the contingency plan.

c. Pursuant to 320 IAC [4.1–19–4(b)] (40 CFR 265.73(b)(1)), the operating record shall contain a description and the quantity of each hazardous waste received and the method(s) and date(s) of each waste's treatment, storage, or disposal at the facility as required by Appendix I of 40 CFR 265. Based on my review of the record, CCCI has not provided a description and the quantity of each hazardous waste received and the method(s) and date(s) of each waste's treatment, storage, or disposal at the facility as required by Appendix I in operating record.

d. Pursuant to 320 IAC [4.1–16–5(b)] (40 CFR 265.14(b)), security measures shall include 24–hour surveillance or an artificial or natural barrier around the facility with a means to control entry. Based on my observations, CCCI has not provided se-

curity measures which include 24–hour surveillance or an artificial or natural barrier around the facility with a means to control entry. There is no controlled entry at the facility and the fence is in bad repair.

e. Pursuant to 320 IAC [4.1–17(2)] (40 CFR 265.31), the owner or operator shall manage hazardous wastes to prevent fire, explosion, or release of hazardous waste or hazardous waste constituents on premises which could threaten human health or the environment. Based on my observations, there is evidence of the release of hazardous waste or hazardous waste constituents on premises which could threaten human health or the environment. This release occurred when the surface impoundments were allowed to overflow.

f. Pursuant to IC 13–7–4–1(c), no person shall deposit any contaminants upon the land in such place and manner which creates, or which would create a pollution hazard. Based on my observations, CCCI has deposited contaminants upon the land. This deposition is a result of the overflow of the surface impoundment, and the spillage from tank number 19 which is leaking, and the spillage which has occurred in the general operating area.

g. Pursuant to 320 IAC [4.1–15–7(b) and (3)] (40 CFR 265.56(b) and (j)), whenever there is a release of hazardous waste, the mergence coordinator must immediately identify the character, exact source, amount, and a real extent of any released materials. Based on my observations, CCCI has not identified the spilled material at the facility.

h. Pursuant to 320 IAC [4.1–25–2, –3] (40 CFR 265.222), a minimum of 60 cm. (two feet) of freeboard shall be maintained in the surface impoundment. Based on my observations, CCCI has not maintained a minimum of 60 cm. (two feet) of freeboard in

the hazardous waste surface impoundment.

i. Pursuant to 320 IAC [4.1–25–4] (40 CFR 265.223), earthen dikes shall have a protective cover. Based on my observations, CCCI has not provided a protective cover for earthen dikes at the surface impoundments.

j. Pursuant to 320 IAC [4.1–20–1 through 20–5] (40 CFR 265.90 [through 265.94]), the owner or operator of a surface impoundment which is used to manage hazardous waste must implement a groundwater monitoring program capable of determining the facility's impact on the quality of groundwater in the uppermost aquifer underlying the facility. Based on my observations, CCCI has not implemented a groundwater monitoring program for the surface impoundments.

Many of the tanks on the facility were leaking and there is overall evidence of substantial spills or releases of tank and surface impoundment contents onto the ground both on and off the facility.

Defendants admit that no brief outline of emergency equipment capability was included in the contingency plan as required by 320 IAC 4.1–18–3(e) (40 C.F.R. 265.-52(e)), cited in Warner's list of violations at paragraph (b). Defendants also admit that CCCI's operating records did not have a code number for materials identified in them, therefore admitting in part the violation described in paragraph (c) of Warner's affidavit. Defendants assert these violations are *de minimis*, however, and argue that there are substantial factual disputes as to the other alleged violations.

Defendants base their claims of factual disputes on two grounds: (1) CCCI does not have a surface impoundment (land disposal unit), so certain of the regulations which were allegedly violated do not apply, and (2) defendants deny that the activity or omissions underlying some of the violations ever occurred.

With respect to the first argument, the court has already found that at least one land disposal unit—Basin 19—exists at CCCI's Gary facility. The claim that the interim status regulations at issue do not apply because there is no land disposal unit therefore is without merit. The regulations do apply.

Defendants' second argument—that the actions or omissions never occurred—is largely unsupported. Defendants offered no affidavit whatsoever to counter the Warner affidavit. Defendants do refer to a certified answer filed on September 20, 1985, by defendant CCCI and signed by Hjersted in Cause No. N 264 before the Environmental Management Board of the State of Indiana, a document to which the United States refers as well. That document, however, was in the record only as an exhibit in the preliminary injunction hearing held in this case in March, 1986, and was released on September 3, 1987, upon plaintiff's unopposed motion. Neither party has included a copy of the relevant portion(s) of that document with the summary judgment filings. The court, therefore, does not have the document before it to consider when ruling on the motion for partial summary judgment. The court will not speculate as to what is contained in a document not in the record, and will consider only the actual record before it.

Defendants' bald denials in their response to plaintiff's motion are not by themselves adequate to controvert Warner's affidavit. *See* Fed.R.Civ.P. 56(e).[13] *See also* Rule 11 of the General Rules of the United States District Court for the Northern District of Indiana.

Defendants also support their claim that certain of the alleged violations never occurred by asserting that the Warner affida-

---

**13.** Fed.R.Civ.P. 56(e) provides in pertinent part: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

vit, as well as the other affidavits submitted by the United States, are conclusory. With respect to the Warner affidavit, however, defendants challenge only paragraph (g): "Based on my observations, CCCI has not identified the spilled material at the facility." The court does consider this clause to be vague in that it does not specify what spilled material has not been properly identified. There is no dispute, however, that various materials have been spilled at the Gary facility, *see e.g.*, Hjersted affidavit at ¶ 11, Jan. 20, 1987 (filed Jan. 21, 1987), and defendants do not so much as allege, much less support by affidavit or otherwise, that defendants did in fact identify any of that spilled material as mandated by 320 IAC 4.1–18–7(b) and (j) and 40 C.F.R. § 265.56(b) and (j). Thus, the court finds that paragraph (g) of the Warner affidavit, taken in conjunction with the remainder of the record, sufficiently supports plaintiff's allegations that a violation of 320 IAC 4.1–18–7(b) and (j) (40 C.F.R. § 265.56(b) and (j)), occurred, and that defendants have not raised a disputed factual issue on that point.

In sum, the court finds the United States has sufficiently supported its claims that defendants violated numerous interim status regulations, and defendants have failed to controvert those claims so as to raise disputed issues of material fact. Summary judgment in favor of plaintiff United States is therefore appropriate.

### Conclusion

For the reasons stated above, the court finds plaintiff United States has established liability under RCRA on the part of defendants CCCI and Norman B. Hjersted, for violating the regulations governing closure plans and certain interim status requirements. Accordingly, the court GRANTS plaintiff United States' motion for partial summary judgment on the issue of liability. The issue of remedies, of course, remains to be determined.