**STATE of Missouri, ex rel. William WEBSTER, Attorney General, and Missouri Department of Natural Resources, Plaintiffs–Appellants,**

v.

**MISSOURI RESOURCE RECOVERY, INC., and Frank E. Hostetter, Defendants–Respondents.**

No. 17271.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 14, 1992.

Motion for Rehearing or Transfer
Denied March 9, 1992.

Application to Transfer Denied
April 21, 1992.

---

919

**920**

William L. Webster, Atty. Gen., Shelley A. Woods, Asst. Atty. Gen., Jefferson City, for plaintiffs-appellants.

John A. Parks, Humansville, for defendants-respondents.

SHRUM, Presiding Judge.

This case arises from the efforts of the state of Missouri, acting at the instigation of the Missouri Department of Natural Resources (DNR),[1] to obtain a judicial determination that Missouri Resource Recovery, Inc., a Missouri corporation (MRR Inc.), and its president Frank E. Hostetter[2] violated the "Hazardous Waste Management Law."[3] DNR sought injunctive relief against the defendants based on common law nuisance principles and provisions of Missouri's Hazardous Waste Management Law. Additionally, DNR sought civil penalties for alleged violations of the Hazardous Waste Management Law.

By its judgment, the trial court (a) dismissed defendant Hostetter from the case because of its conclusion that Hostetter was not liable for any of the alleged wrongs of the corporation; (b) dismissed all counts against MRR Inc. except Count IV on the basis that the evidence failed to support the plaintiffs' allegations; (c) determined that MRR Inc. had buried solid wastes in an area not permitted for solid waste disposal (at the "Roscoe site") and fined MRR Inc. $500 for that violation (Count IV); (d) found that the materials present at the MRR Inc. facility site and the physical characteristics of that site as referred to in Count III were a public nuisance but determined that the plaintiffs had caused this nuisance by (1) failing to properly administer the Hazardous Waste Management Law and (2) "putting [MRR Inc.] out of business without giving it a chance to properly dispose of its accumulated materials"; (e) found that the plaintiffs had a duty to "abate" the nuisance; and (f) ordered the plaintiffs to pay $12,724.91 of the defendants' attorney fees and $762.89 in court costs. It is from this judgment that the plaintiffs appeal.

We affirm in part, reverse in part, and reverse and remand in part.

## BACKGROUND

I. Business of MRR Inc.; Materials at Facility Site

MRR Inc. was initially certified by DNR on April 15, 1983, to operate a "resource recovery"[4] facility. The restrictions imposed by DNR as part of its initial certification are contained in a letter dated April

---

1. Section 260.425.1, RSMo 1986, reads, in part: "[The DNR] may request either the attorney general or a prosecuting attorney to bring any action authorized in this section in the name of the people of the state of Missouri." In this opinion, we use the term "plaintiffs" to refer collectively to the state of Missouri and the DNR.

2. We use the term "defendants" to refer collectively to MRR Inc. and Frank Hostetter.

3. "Sections 260.350 to 260.430 shall be known and may be cited as the 'Missouri Hazardous Waste Management Law.'" § 260.350, RSMo 1986.

4. Section 260.360(14), RSMo Supp.1981, reads: "**Resource recovery**", the reclamation of energy or materials from waste, its reuse or its transformation into new products which are not wastes.

18, 1983.[5] That letter is attached to this opinion as Appendix "A." In May 1985, DNR renewed the certification for an additional two years. See Appendix "B." By this 1985 certification, MRR Inc. was limited to accepting "only those wastes classified as F003 and F005."[6] Application by MRR Inc. for a third certification was denied by DNR on May 5, 1987.

After initial certification, MRR Inc. began reclaiming the non-halogenated solvents it was authorized to receive. Primarily, it received wastes from two Kansas City firms, Davis Paint and Drake Design. The Davis Paint waste was generated from the cleaning of paint vats and was primarily a xylene/toluene mixture. The Drake Design waste was acetone, "possibly from a fiberglass process, and a 20% pigmented polyester resin." The defendants acknowledge that the materials received from Davis and Drake were "hazardous wastes."

A distillation process, which includes use of a boiler, was used by MRR Inc. to reclaim the waste solvents. The reclaimed solvents were then sold back to Davis Paint and Drake Design. The distillation process leaves a solid material known as "still bottoms" in the still. Under the terms of the certification, MRR Inc. was authorized to use the still bottoms as boiler fuel. (See Appendix "A".) Authorization to burn the still bottoms was never withdrawn until recertification was denied in May 1987.

One of the many violations charged by DNR involved the solid material remaining in the bottom of barrels after the liquid part of the waste solvent is pumped off. DNR refers to that material as "sludge." The record is devoid of evidence which identifies the physical characteristics or the chemical makeup of the sludge. The defendants burned sludge in the boiler, mixing it with the still bottoms to use as a fuel. DNR's certification did not specifically authorize MRR Inc. to use sludge in that manner.

Flash point analyses were made on samples of liquids taken from barrels at the facility site. Those liquid samples were taken in June 1987 and in August 1989. The liquid samples exhibited the characteristic of ignitability. Under all versions of the DNR regulations, ignitability is a characteristic of non-listed hazardous wastes. See, e.g., 10 CSR 25–4.010(2) (June 1984).[7]

Another alleged violation concerns the ash which remains in the boiler after burning the still bottoms and other fuels. The defendants admitted that some of the ash was dumped on gravel driveways at the MRR Inc. site but denied that the ash was a hazardous waste. DNR claims that the ash was one of many hazardous waste materials which the defendants did not handle in accord with state laws and regulations. There is no evidence in the record that samples of ash were analyzed.

---

5. Specifically authorized were the following waste materials: "Ethanol (Ethyl Alcohol), Acetone, Ethyl Ether, N. Butyl Alcohol, Ethyl Acetate, Isobutyl Alcohol, Methanol (Methyl Alcohol), Methyl Ethyl Ketone, and Pyridine."

6. 10 CSR 25–4.010(6)(E) (June 1984) lists the following as "Hazardous waste from nonspecific sources":

> F003 ...The following spent non-halogenated solvents: xylene, acetone, ethyl acetate, ethyl benzene, ethyl ether, methyl isobutyl ketone, n-butyl alcohol, cyclohexanone, and methanol, and the still bottoms from the recovery of these solvents.　　(I)
>
> ....
> F005 ...The following spent non-halogenated solvents: toluene, methyl ethyl ketone, carbon

disulfide, isobutanol, and pyridine; and the still bottoms from the recovery of these solvents.　　(I,T)

7. Ignitable Harzardous [sic] Waste. A. Characteristics.

1. Any waste that has any of the following characteristics shall be managed as an ignitable hazardous waste:

A. Is a liquid waste and has a flash point of less than 60°C (140°F) as determined by the method cited in paragraph (2)(B)1. or equivalent method;

B. It is not a liquid and is capable, under standard pressure and temperature, of causing fire through friction, absorption of moisture, spontaneous chemical changes or retained heat from manufacturing or processing, or which can be ignited readily and when ignited burns so vigorously and persistently as to create a serious hazard....

By their answer, the defendants admit that as of November 9, 1987, there were 60,000 gallons of methanol and approximately 600 drums of ignitable material at the MRR Inc. facility. The trial court found (and the evidence supports the finding) that in late 1986 MRR Inc. expected to enter into a contract to process significantly larger amounts of wastes, and in order to have an adequate fuel supply, it had stockpiled several hundred drums of still bottoms and sludges.

## II. The Roscoe Site

The defendant Frank E. Hostetter and his wife Mary own a farm near Roscoe, Missouri. In the spring or summer of 1986, a number of 55–gallon barrels were hauled from the MRR Inc. facility to the "Roscoe site." Hostetter made the decision to take the barrels to that site and he personally transported the materials. Trenches were dug with a backhoe and the barrels were buried.

In July 1986, DNR received a citizen complaint about the burial of drums at the Roscoe site. That complaint prompted an investigation by DNR. During the investigation, a DNR employee learned that the buried barrels were being excavated. That employee immediately confronted Hostetter who admitted he had been aware that DNR was investigating. He knew of the neighbors' concerns regarding the barrels and, to alleviate those concerns, decided he "would dig those drums up."

Soil sampling was performed at the Roscoe site by DNR. Analyses of the samples revealed traces of arsenic, barium, cadmium, chromium, and lead. Flash point analyses were made on the Roscoe site soil samples and four of the samples exhibited the characteristic of ignitability.

## III. Statutory and Regulatory Framework [8]

In 1976, the United States Congress enacted the Resource and Recovery Act, 42

U.S.C. § 6901 *et seq.* (RCRA). The RCRA represented an attempt by Congress to deal with problems posed by the general disposal of wastes in this country, including the particular problems associated with hazardous wastes. *U.S. v. Aceto Agr. Chemicals Corp.,* 872 F.2d 1373, 1376 (8th Cir.1989). The RCRA has been amended three times since enactment and provides what Congress calls a "prospective cradle-to-grave regulatory regime governing the movement of hazardous waste in our society." *Id.* at 1376–77. *Environmental Defense Fund v. E.P.A.,* 271 App.D.C. 349, 852 F.2d 1316, 1318 (1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). Under RCRA, Congress has authorized the United States Environmental Protection Agency (EPA) to issue permits for the operation of hazardous waste disposal facilities, to promulgate standards for transporters of hazardous wastes and operators of hazardous waste facilities, and to identify hazardous wastes. *Aceto,* 872 F.2d at 1377.

Pursuant to § 3006(b) of the RCRA (42 U.S.C. § 6926), the federal government may, when requested to do so, grant individual states the right to administer and enforce their own hazardous waste programs under RCRA. In Missouri, the general assembly, in § 260.375(26), RSMo Supp.1981, directed that DNR "[e]xercise all powers necessary to carry out the provisions of sections 260.350 to 260.430, assure that the state of Missouri complies with any federal hazardous waste management act and retains maximum control thereunder...." DNR applied to the EPA for authority to operate Missouri's hazardous waste program in lieu of the federal program. Effective December 4, 1985, Missouri received such authority. 50 Fed.Reg. 47740.

As part of its initial enactment of the Missouri Hazardous Waste Management Law, our general assembly authorized DNR to promulgate rules and regulations

---

**8.** We discuss federal regulation of hazardous wastes briefly because, as outlined later, Missouri's authority to regulate is derived from the federal law. *See* 42 U.S.C. § 6926(b). Additionally, in 1986, many of the EPA regulations were incorporated by reference into the DNR regulations.

establishing criteria to determine whether any waste is hazardous. H.B. 318, p. 418, § 5(1)(a), Laws of Mo.1977. By § 260.370.-3(1)(a), RSMo Supp.1981, the Commission's authority to promulgate rules and regulations was extended to "establishing criteria *and a listing* for the determination of whether any waste or combination of wastes is hazardous...." (Emphasis added.) Various regulations were promulgated pursuant to the foregoing authority, including 10 CSR 25–4.010 Hazardous Waste Identification (October 1979). Regulation 10 CSR 25–4.010 was frequently amended until, during the period pertinent to this case, it closely tracked EPA's regulations on the subject of hazardous waste identification. *See* 40 C.F.R. Part 261, Subparts B, C, and D.

The federal regulations contained two categories of hazardous wastes: "listed" and "characteristic." Those wastes which have been determined to be hazardous by definition have been assigned certain identification numbers and are referred to as "listed wastes." 40 C.F.R. §§ 261.30–261.-33(f) (July 1, 1983). *See also* 10 CSR 25–4.010(6) (June 1984). "Characteristic hazardous wastes" are deemed such only if they exhibit one of the following four characteristics: corrosivity, ignitability, reactivity, or toxicity, 40 C.F.R. §§ 261.21–261.-33(f) (July 1, 1983), and are not otherwise

exempt from classification as a hazardous waste. 40 C.F.R. §§ 261.3(a)(1) and 261.4. Comparable provisions in Missouri are found in 10 CSR 25–4.010(2)–(5) (June 1984), §§ 260.355 and 260.380, RSMo Supp. 1981, and 10 CSR 25–4.010(1)(E) (June 1984). In 1986, DNR withdrew 10 CSR 25–4.010 and adopted 10 CSR 25–4.261 by which it incorporated, by reference, the federal regulations on hazardous waste identification, specifically 40 CFR Part 261.[9]

From the beginning, hazardous waste facility owners and operators in Missouri were required to have a permit to operate a hazardous waste facility, § 260.395.7, RSMo Supp.1981,[10] and DNR had the duty to require a permit for each such facility. § 260.375(12), RSMo Supp.1981.[11] Licensing by DNR was also required for hazardous waste transporters. §§ 260.375(11) and 260.395.1. Entities defined as hazardous waste "generators"[12] were to be regulated. § 260.380.1, RSMo Supp.1981.[13]

The apparent intent of the general assembly was "to establish a 'cradle-to-grave' hazardous waste tracking program that, among other things, requires the documentation of the movement of hazardous waste by the generator of the hazardous waste, the transporter, if any, and by an appropriate treatment, storage, or disposal facili-

---

**9.** Since October 1986, 10 CSR 25–4.261 has incorporated not only EPA's lists of hazardous waste into its regulations but has also listed other types and quantities of wastes as hazardous. *See* 10 CSR 25–4.261(2)(D). At least one commentator suggests that the DNR's authority to list waste as hazardous is arguably broader than EPA's authority because of a different definition of "hazardous waste" found in § 260.-360(10). 2 Mo. Environmental Law, § 11.16 (MoBar 1991).

**10.** Section 260.395.7, RSMo Supp.1981: "After six months from the effective date of the standards, rules and regulations adopted by the commission pursuant to section 260.370, it shall be unlawful for any person to construct, substantially alter or operate a hazardous waste facility without first obtaining a hazardous waste facility permit for such construction, alteration or operation from the department...."

**11.** Section 260.375(12), RSMo Supp.1981: "The department shall: ... [r]equire each hazardous

waste facility owner and operator to obtain a permit for each such facility...."

**12.** Section 260.360(8), RSMo Supp.1981, defined "Generator" as "any person who produces waste."

**13.** Among their duties, generators must (a) file reports with the DNR (§ 260.380.1(1)); (b) use only a hazardous waste transporter holding a license (§ 260.380.1(5)); (c) provide a separate manifest to the transporter for each load (§ 260.380.1(6)); and (d) "[u]tilize for treatment, resource recovery, disposal or storage of all hazardous wastes, only a hazardous waste facility holding a permit under sections 260.350 to 260.430, or a hazardous waste management act of the federal or any other state government, or a resource recovery or other facility exempted from the permit required under section 260.-395." (§ 260.380.1(7)). All citations are to RSMo Supp.1981.

ty." 2 Mo.Environmental Law, § 11.1 (Mo-Bar 1991).

In both the federal and Missouri regulatory framework, there are exclusions and variances by which some materials are exempted from hazardous waste categorization. "Generally, the exclusions and variances fall into two broad categories—first, a series of specific exceptions based on varied policies and interests; second, exclusions and variances which encourage the recycling of hazardous wastes." 2 Mo.Environmental Law, § 11.22 (MoBar 1991). From the beginning, our general assembly recognized *"resource recovery"* as one of the exclusions or variances from hazardous waste storage permit or disposal-facility permit requirements. *Id.* at § 11.26. In doing so, the legislature first defined *resource recovery* as "the reclamation of energy or materials from waste, its reuse or its transformation into new products which are not wastes." § 260.360(14), RSMo Supp.1981. Then, the legislature exempted "resource recovery facilities" from the requirement to obtain a permit if the facility uses hazardous waste as a supplement to or substitute for nonwaste material and if the facility's sole purpose is to manufacture a "product" rather than treat or dispose of hazardous waste. §§ 260.395.13(3) and (4), RSMo Supp.1981.[14]

The general assembly also provided that a hazardous waste facility permit is not required for "[o]n-site storage of hazardous wastes [where such storage is] exempted by the commission by rule or regulation...." § 260.395.13(1), RSMO Supp. 1981. That legislation was followed in short order by 10 CSR 25–9.010 promulgated by DNR which exempted "resource recovery facilities" from permit requirements.[15] The provisions exempting re-source recovery facilities from the usual hazardous waste permit requirements have remained a part of the Missouri Hazardous Waste Management Law, although they have been frequently amended.[16]

Each time DNR certified MRR Inc. as a resource recovery facility it specifically conditioned the certification upon MRR Inc.'s compliance with 10 CSR 25–9.010. Additional facts and background will be given as necessary to explain our resolution of various issues.

## STANDARD OF REVIEW

■ Our review of this court-tried case is governed by Rule 73.01(c) and *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). Thus we will sustain the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 32.

## DISCUSSION AND DECISION

I. Liability of Corporate Officer

■ In Point III, the plaintiffs argue that the trial court erred in dismissing Hostetter from the action because, as the corporate officer who handled the day-to-day operations of the corporation, he was liable individually for any of the acts which violated Missouri's Hazardous Waste Management Law. They claim that the general rule in Missouri is that a corporate officer is personally liable for his or her own wrong, citing *Boyd v. Wimes,* 664 S.W.2d 596 (Mo.App.1984) (involving fraudulent misrepresentation and conversion of borrowed funds), and *Osterberger v. Hites Const. Co.,* 599 S.W.2d 221 (Mo.App.1980)

---

**14.** Section 260.395.13(3): "A hazardous waste facility permit is not required for: (3) A resource recovery facility which the department certifies uses hazardous waste as a supplement to, or substitute for, nonwaste material, and that the sole purpose of the facility is manufacture of a product rather than treatment or disposal of hazardous wastes."

**15.** The original 10 CSR 25–9.010, which spelled out the certification procedures and described the standards which various resource recovery

facilities must meet, was promulgated by the DNR effective August 1, 1982.

**16.** 10 CSR 25–9.010 *Resource Recovery* has been amended by the DNR effective July 19, 1985, October 1, 1986, August 1, 1987, and April 12, 1988. The regulation was rescinded effective December 31, 1990. A new regulation effective December 31, 1990, 10 CSR 25–9.020, describes the certification requirements for hazardous waste resource recovery processes.

(involving fraudulent concealment of existence of outstanding deed of trust).

In dismissing Hostetter from the lawsuit, the trial court rejected the plaintiffs' attempt to apply the rule enunciated in *Boyd* and *Osterberger*. The trial court concluded there was a lack of evidence that Hostetter or MRR Inc. had "engaged in any acts that could be described as a positive or actionable wrong." The court concluded that, although the plaintiffs had proven that Hostetter "handled the day to day operations of the corporation," he was not individually liable for violations of the Hazardous Waste Management Law. For the reasons which follow, we find that the trial court erred in that determination.

One commentator has suggested that the traditional rule that a corporate officer, director, shareholder, or employee is not personally liable for the torts of the corporation has been slowly eroded away in environmental cases. 1 Mo.Environmental Law, § 4.12 (MoBar 1991). While this specific issue is one of first impression in Missouri, our supreme court has determined that the preservation of the public health is a goal of the highest priority and that the legislature's intention in adopting Missouri's Hazardous Waste Management Law is to prevent hazardous waste mismanagement practices. *Jerry–Russell Bliss v. Hazardous Waste*, 702 S.W.2d 77, 81 (Mo. banc 1985). In *Bliss*, DNR denied a hazardous waste transporter's permit to a newly-formed corporation because of the hazardous waste management practices engaged in by the officers, directors, and employees of the corporation while acting in their individual capacities before formation of the corporation and before enactment of the Missouri Hazardous Waste Management Law. The supreme court affirmed, holding that there was sufficient evidence to show that the corporation "was a continuation of Bliss Waste Oil Company [unincorporated family business] and, as such, responsible for the actions of the latter, its principals and its employees." *Id.* at 83. The argument by the newly-formed corporation that DNR should not be allowed to pierce the "corporate veil" to hold the corporation accountable for the previous acts of its principals and employees was rejected as having "no application to the relationship between a successor corporation and its predecessor entity." *Id.*

Admittedly, *Bliss* is not direct authority for imposing liability on officers and directors for a corporation's torts. However, we read *Bliss* as directing that we must broadly and liberally interpret the Hazardous Waste Management Law in an effort to achieve the desired result of deterring hazardous waste mismanagement practices.

Numerous federal courts have said that when violations of hazardous waste management laws are charged, corporate veil issues need not be addressed and corporate officers can be held directly liable when the liability is based on their direct involvement in the hazardous waste management activities. *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 743–44 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *United States v. Pollution Abatement Services*, 763 F.2d 133, 135 (2d Cir.), *cert. denied*, 474 U.S. 1037, 106 S.Ct. 605, 88 L.Ed.2d 583 (1985); *United States v. Conservation Chemical Co. of Illinois*, 733 F.Supp. 1215, 1221–22 (N.D.Ind.1989); *United States v. Conservation Chemical Co.*, 628 F.Supp. 391, 419–20 (W.D.Mo.1985). *See also State v. Rollfink*, 162 Wis.2d 121, 469 N.W.2d 398 (1991) (state court held that a corporate officer is personally liable for violations of Wisconsin's hazardous waste laws committed by the corporation if the officer is responsible for the overall operation of the corporation's facility which violated the law).

Although we are not bound by the decisions of federal courts or courts of other states, such decisions are particularly instructive on environmental law questions. This follows because Missouri's law and regulations on this subject (as is the case in other states) must be equal to or more stringent than the federal regulations.

Generally, imposing individual civil liability for corporate activities upon officers

who are directly responsible for statutorily proscribed hazardous waste activity is grounded upon the belief that to do so comports with the expansive construction that courts have given environmental statutes. *Pollution Abatement Services,* 763 F.2d at 135.

In the Eighth Circuit, Judge McMillian reasoned that to impose liability upon the corporation and not the corporate officers who actually make corporate decisions and control the conduct of the corporation would be inconsistent with Congress's intent to impose liability upon all persons who are involved in the handling and disposal of hazardous substances. *Northeastern Pharmaceutical,* 810 F.2d at 745.

We believe that the same reasoning applies to Missouri's Hazardous Waste Management Law. Our supreme court has said that one who habitually engages in hazardous waste management practices which pose a threat to the health of humans or the environment is a menace to the public health. *Bliss,* 702 S.W.2d at 81. An individual is no less a menace when his mismanagement practices are carried out while he is serving as a director, officer, or employee of a corporation. The end result of such mismanagement is harm to the public health, a result contrary to what the general assembly intended.

We believe the general assembly had a wide-ranging intent to impose liability upon all persons involved in the handling and disposal of hazardous wastes, including officers and directors of a certified resource recovery facility, when the officer or director actively controls or is directly involved in the proscribed activity. This is consistent with other courts' interpretations of the general statutory scheme for liability in the disposal of hazardous waste. *See, e.g., Northeastern Pharmaceutical,* 810 F.2d at 726; *Pollution Abatement Services,* 763 F.2d at 133; *Conservation Chemical Co. of Illinois,* 733 F.Supp. at 1222; *Conservation Chemical Co.,* 628 F.Supp. at 419–20; *Rollfink,* 469 N.W.2d

398. The key is the director's or officer's ability to control the conduct or that person's direct involvement in the particular activity alleged to be in violation of the statute. *Northeastern Pharmaceutical,* 810 F.2d at 743–44. Courts have identified "the vital factor" to be whether the individual was "in charge of the operation of the facility in question...." *See Kelley v. Thomas Solvent Co.,* 727 F.Supp. 1532, 1560–61 (W.D.Mich.1989).

From this record, it is clear that Hostetter's involvement was substantial. While serving as a corporate officer, director, and employee, he was a "hands-on" operator. He individually participated in and directed all the activities of the corporation. Hostetter admits, and the record fully supports, that he had responsibility for the day-to-day operation of the business. Hostetter's decisions and his actions are the source of plaintiffs' charges against MRR Inc. Hostetter had the ability to control the activities of MRR Inc. which gave rise to this lawsuit and he did control those activities. To the extent that we reverse the judgment and remand for further proceedings against MRR Inc., we reverse and remand the judgment dismissing Hostetter as a defendant.

**II. Did Trial Court Err in Finding No Violations of Missouri's Hazardous Waste Management Law (Plaintiffs' Points I and II)?**

In Point I, the plaintiffs claim that "the trial court erred in finding that the still bottoms, the wastes buried at the Roscoe site and the ash from the incineration of the still bottoms and sludges were not hazardous wastes because said wastes are hazardous wastes in that said wastes meet the statutory and regulatory definitions for hazardous wastes." By their argument, the plaintiffs suggest that MRR Inc.'s operations were regulated under both the "old regulations" and the "new regulations."[17] They then proceed to argue that "since at least October 1986, 10 CSR 25–

---

**17.** This is an apparent reference to the practice, begun in 1986, of incorporating federal regulations by reference into state regulations. However, the plaintiffs rarely include in their brief the effective date of cited regulations and statutes, despite their frequent changes.

4.261 now defines what is a hazardous waste ... by incorporating by reference 40 C.F.R. Part 261." The plaintiffs quote various provisions of 40 C.F.R. Part 261 (without citing effective dates) and various provisions of Missouri's Hazardous Waste Law and regulations (without citing effective dates) to reach the following conclusion: "Because the stillbottoms, sludges and ash fall within the statutory and regulatory definitions of hazardous wastes, respondents stored, disposed and otherwise managed those hazardous wastes in violation of the Missouri Hazardous Waste Management Law, §§ 260.350 through 260.434, RSMo, and the regulations promulgated pursuant thereto."

We acknowledge that selected federal and state hazardous waste statutes and regulations, especially as they existed after 1986 and especially if read in a vacuum and without regard to the facts, might be interpreted as requiring a determination, as a matter of law, that the still bottoms, sludges and ash described in this record were hazardous wastes. However, we decline to consider those statutes and regulations in a vacuum and without regard to the facts.

The general assembly and DNR have encouraged resource recovery as a method of handling hazardous wastes. There has been a continuing recognition by DNR that persons who engage in hazardous waste resource recovery do, indeed, operate hazardous waste facilities but, nonetheless, those persons may be exempted from the usual hazardous waste facility permits and regulations. For example, in the summary of comments on proposed 10 CSR 25–9.010, 7 Missouri Register 1073–74 (July 1, 1982), the Hazardous Waste Commission said:

> One commenter felt that a resource recovery facility should not have to be labeled as a hazardous waste management facility. The commission would like to minimize the bad connotation associated with being a hazardous waste management facility, but feels that resource recovery is a good method of managing hazardous wastes and by promoting positive aspects of resource recovery, the public opinion may change for the better.
>
> ... The commission feels [that] by promulgating this rule it will encourage those facilities contemplating resource recovery certification to apply in the near future.

Throughout this litigation, the plaintiffs have contended that MRR Inc. was required to have all the usual and normal permits in order to store, handle, or otherwise deal with any hazardous wastes. Yet, some of their own evidence contradicts that position. For example, John D. Doyle, an environmental engineer for DNR whose duties included technical review of applications for hazardous waste permits and resource recovery certifications, described MRR Inc.'s certification as "equivalent to a permit.... It's in lieu of a permit." Doyle's explanation of the state's policy toward resource recovery facilities follows:

> The policy, and again, at this point in time—I should clarify because I think that policy has changed somewhat since then based upon what we've seen—was to encourage resource recovery activities. In fact, that was the basis for the Department allowing this waste to be accepted even though we had serious concerns about it.[18]

In obvious furtherance of its policy to encourage resource recovery, DNR certified MRR Inc. as a resource recovery facility from April 15, 1983, to May 5, 1987, without requiring hazardous waste permits or interim status. Implicit in that certification is recognition by DNR that MRR Inc. was operating a hazardous waste facility. DNR allowed MRR Inc. to commence operation of this hazardous waste facility without requiring hazardous waste permits (or interim status) and it approved MRR Inc.'s continued operation without requiring hazardous waste permits (or interim status) by recertifying the operation in May 1985.

---

18. This explanatory testimony regarding state policy was in response to cross-examination questions about the April 6, 1984, letter from the DNR to MRR Inc. in which the DNR authorized MRR Inc. to accept TCA waste—a listed hazardous waste—without storage permits (or interim status).

Whether materials are hazardous wastes subject to regulation can be mixed questions of law and fact. *State v. Better Brite Plating Inc.*, 160 Wis.2d 809, 466 N.W.2d 239, 244 (1991) (whether sludge in barrels is hazardous is a mixed question of law and fact). *See also Environmental Defense Fund, Inc. v. Wheelabrator Technologies Inc.*, 725 F.Supp. 758 (S.D.N.Y. 1989) (solid waste facility not subject to regulation as hazardous waste site as a matter of law even though ash from resource recovery process failed the EPA toxicity test). Thus, proper appellate review of the issues presented here requires that we not consider Point I in isolation but consider it in conjunction with Point II.

By Point II, the plaintiffs claim that the trial court erred in finding that MRR Inc. did not violate the Hazardous Waste Management Law. They argue that the evidence clearly shows that MRR Inc. stored hazardous waste without a permit, disposed of hazardous waste without a permit, and failed to operate its facility according to its resource recovery certification and the law.

In considering these arguments, we must be ever mindful of the history of the DNR's regulation of this facility. "Questions involving the environment are particularly prone to uncertainty.... [T]he regulators entrusted with the enforcement of [hazardous waste] laws have not thereby been endowed with a prescience that removes all doubt from their decision-making." *Ethyl Corp. v. Environmental Protection Agcy.*, 176 U.S.App.D.C. 373, 541 F.2d 1, 24, *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). Counterbalanced against the foregoing truism is the principle that we must defer to the expertise of administrative agencies in reaching decisions based on technical and scientific data. *Citizens for Rural Preservation, Inc. v. Robinett,* 648 S.W.2d 117, 128 (Mo.App.1982).

### A. *Storage and Disposal at Facility Site*

In one prong of their argument, the plaintiffs assert that MRR Inc. was required to have a hazardous waste storage or disposal facility permit or have interim status for disposal of hazardous wastes even when it was certified as a resource recovery facility. The basis for the plaintiffs' argument appears to be two-fold, one argument focusing on spent solvents and the other on ash, still bottoms, and sludge at the resource recovery site.

#### 1. Spent Solvents at Facility Site During Certification

First, the plaintiffs claim that MRR Inc. did not store its "hazardous wastes" in a secure enclosure and in a manner designed to minimize the possibility of spills and escape as required by 10 CSR 25–9.010(1)(D)4. While 10 CSR 25–9.010(1)(D)4 is part of the resource recovery regulation effective October 1, 1986, the "secure enclosure" requirement existed from the beginning. *See, e.g.,* 10 CSR 25–9.010(1)(D)3.D (August 1, 1982). Because of the alleged storage shortcomings, the plaintiffs argue that MRR Inc. was required by 10 CSR 25–9.010(1)(B)5 [19] to have hazardous waste storage permits. That regulation reads:

> Any owner/operator who stores hazardous wastes and cannot comply with paragraph (1)(D)4 of this rule shall comply with 10 CSR 25–7.265 or obtain a storage permit as required by 10 CSR 25–7.

While the plaintiffs fail to specifically identify the "hazardous waste" they claim was not stored in a safe enclosure, they do refer in their argument to "hazardous wastes received from Davis Paint, et al." The plaintiffs also refer to "hazardous wastes received from off-site on a regular basis." By these references and by the transcript citations in their brief, the plaintiffs limit their argument to the spent solvents received by MRR Inc. at its recovery facility.

---

**19.** As best we can determine, the regulation the plaintiffs cite was effective October 1, 1986. However, similar language is found in preceding versions of the regulation. *See, e.g.,* 10 CSR 25–9.010(1)(D).4, effective August 1, 1982.

After MRR Inc. commenced its recovery business, DNR made periodic inspections of the facility. Even though the trial court excluded the report from evidence, we glean from the record that a compliance inspection was made on December 28, 1983. No complaint was made by DNR as a result of that inspection about lack of storage permits (or lack of interim status). Also conspicuous by its absence was any complaint by DNR of a lack of secure enclosures for the solvents or a failure to store spent solvents in a manner designed to minimize spilling or escape.

In May 1985, DNR approved recertification subject to the following provisions:

1. The operator shall comply with 10 CSR 25–9.010.

2. The operator shall accept only those wastes classified as F003 and F005 and in the amounts specified in the application. The operator is limited to these wastes because of the potential hazard to the environment with any mishandling or improper storage of F001 and F002 wastes. To accept F001 and F002 wastes for reclaim the operator must first obtain a storage permit through the MDNR and USEPA.

From the above recertification document, the trial court certainly could have inferred that DNR did not, as of May 1985, interpret either the law or the facts as requiring that MRR Inc. have hazardous waste permits in order to conduct its recovery process for F003 and F005 wastes. An alleged lack of "secure storage" for the F003 and F005 solvents was not mentioned by DNR in May 1985 as triggering the requirement for MRR Inc. to have storage permits or interim status.

On May 21, 1985, another compliance inspection was conducted by DNR. While the report of that inspection was again excluded from evidence, we can glean from the record that DNR did not cite MRR Inc. for lack of "secure storage."

DNR conducted another compliance inspection at the MRR Inc. facility on Octo-

ber 23, 1986, and noted several violations. However, the 1986 compliance report, received in evidence, did not cite MRR Inc. for alleged failure to have a "secure enclosure," to store spent solvents in a manner designed to minimize spilling or escape, or to have otherwise violated 10 CSR 25–9.010(1)(D)4.

Hostetter testified that, among others, the following DNR employees inspected the site during the period MRR Inc. was certified: Joe Jansen, Scott Boyd, Bert McCullah, Charles Kroeger, Lyle Crocker, James Kavanaugh, Charles Wilhite, John Nixon, and Tracy McCracken.[20] Despite the ongoing inspections, the record is devoid of evidence that during the certification period DNR determined that MRR Inc. was violating 10 CSR 25–9.010(1)(D)4 or found conditions which required that MRR Inc. comply with 10 CSR 25–7.265 or have storage permits.

Likewise, the record lacks evidence that MRR Inc. changed or altered its procedure in receiving, storing, or handling spent solvents throughout the time it was certified. This continuity of procedure and practice, coupled with continued certification by DNR through May 5, 1987, plus inspections that did not reveal violations, provides substantial evidence to support the trial court's judgment that the defendants did not violate Missouri's Hazardous Waste Management Law by receiving F003 and F005 hazardous wastes during the certification period or failing to store its F003 and F005 wastes in a secure enclosure and in a manner designed to minimize the possibility of spills and escape as required by 10 CSR 25–9.010(1)(D)4. The judgment is affirmed insofar as it determines that no violation of the law was committed by the defendants in receiving and storing F003 and F005 wastes during the certification periods.

### 2. Liquids at Facility Site After Certification Expired

■ As to the solvents and other liquids on the site after May 5, 1987, we reach a different conclusion. The defendants admitted that there were numerous barrels of

---

**20.** The transcript indicates the name "McCrack- en" was spelled phonetically.

liquid materials on the site when DNR declined to renew their certification in May 1987. Indeed, as part of their answer to Count III, the defendants admitted that "there is on hand approximately 60,000 gallons of menthanol [sic] and approximately 600 drums, some of which contain ignitable substances used for fuel for manufacturing." Hostetter testified that some of the 600 barrels contained still bottoms and sludges, and some contained liquids. He further testified that some of the barrels contained acetone and xylene received from Lake River Corporation. Additionally, flash point tests made by DNR employees on liquid samples drawn after May 5, 1987, from some of the 600 barrels demonstrate that the liquids had the hazardous waste characteristic of ignitability.

Finally we note that the trial court found that the MRR Inc. site "now poses a hazard to the environment and the public welfare." We agree. We further find that the "hazard" is caused, in part, by the liquid materials left at the site which were shown to have the characteristic of ignitability. Any other determination is against the weight of the evidence.[21] MRR Inc. did not have the hazardous waste permits or interim status required by the Hazardous Waste Management Law after May 5, 1987, and it no longer was exempt from having such permits after its resource recovery certification expired. The portion of the judgment which declares that the defendants did not violate the Hazardous Waste Management Law by storing liquids, which had the hazardous waste characteristic of ignitability, at the MRR Inc. facility after May 5, 1987, is against the weight of the evidence and is reversed and remanded.

### 3. Still Bottoms, Ash, and Sludge at Facility Site

The plaintiffs rely heavily on their Point I argument that still bottoms, sludges, and ash at the MRR Inc. recovery site are hazardous wastes as a matter of law to support their Point II claim that the trial court erred in finding that the defendants

had not violated the Hazardous Waste Management Law. Specifically, the plaintiffs' brief reads, "As explained above in Point I, the stillbottoms, sludges and ash at the Missouri Resource Recovery Site are hazardous wastes." They then argue that the defendants' storage and disposal of those materials at the resource recovery site violated the law because MRR Inc. did not have the required permits nor did it have "interim status" that would permit the storage or disposal of hazardous wastes.

### (a) *Still Bottoms at Facility Site During Certification*

■ Still bottoms from F003 and F005 wastes are hazardous wastes as a matter of law. As early as July 1981, DNR, by regulation, declared that the still bottoms from the recovery of certain non-halogenated solvents were hazardous wastes; the F003 wastes because of the "ignitability" characteristic and F005 wastes because of both ignitability and toxic characteristics. *See* 10 CSR 25–4.010(6)(G) (July 1981). That portion of 10 CSR 25–4.010(6)(G) underwent no significant change until DNR rescinded it in July 1986. In the successor regulation, 10 CSR 25–4.261, DNR incorporated the federal regulations, including 40 CFR § 261.32, which declares the F003 and F005 still bottoms to be hazardous wastes.

■ Despite its classification of these still bottoms as hazardous wastes, DNR obviously interpreted the law and its regulations as authorizing their disposal by burning them as part of a resource recovery process, i.e., using the still bottoms as boiler fuel. That interpretation is implicit in MRR Inc.'s certification, which did not require hazardous waste permits, and is consistent with DNR's purpose of encouraging resource recovery. There is substantial evidence to support a determination by the trial court that during certification, DNR exempted MRR Inc. from the usual requirement that it have hazardous waste

---

**21.** For reasons hereinafter discussed, we reject the trial court's conclusion that the "hazard" at the MRR Inc. site was "the result of plaintiff's actions...." That portion of the judgment results from a misapplication of the law and is against the weight of the evidence.

permits. For example, DNR environmental engineer Doyle described MRR Inc.'s certification as being "equivalent" to a permit and "in lieu of" a permit.

In addition, during part of the time period in which MRR Inc. was certified, 10 CSR 25–4.010(1)(G)4.B (June 1984) excluded some fuel mixtures which contained hazardous waste from classification as hazardous wastes. Specifically, that regulation reads:

4. The following mixtures do not constitute hazardous wastes [with exceptions not applicable here]:

. . . .

B. Hazardous wastes which are listed under section (6) of this rule with hazard code I [includes F003 wastes], or ignitable hazardous wastes which are hazardous solely because the characteristic of ignitability, 4 as determined under section (2) of this rule, once blended or mixed into fuels, if the heating value of each hazardous waste component is greater than 8,000 BTU's per pound, and where the blending or mixing occurs at a certified resource facility under 10 CSR 25–9

. . . .

It is apparent from 10 CSR 25–4.010(6)(G) that the F003 still bottoms were hazardous wastes; however, once the still bottoms were mixed or blended into fuels, the resulting mixture might not be a hazardous waste. We recognize that 10 CSR 25–4.010(1)(G)4.B (June 1984) was not in force throughout the certification period; nevertheless, the regulation illustrates that DNR made exceptions for resource recovery facilities as part of its policy of encouraging resource recovery.

■ There is no evidence in the record, scientific or otherwise, that contradicts DNR's original interpretation that MRR Inc. did not have to have hazardous waste permits while certified as a resource recovery facility. We defer to the expertise of an administrative agency in reaching decisions based on scientific and technical data. *Smithkline Corp. v. Food & Drug Administration*, 190 U.S.App.D.C. 210, 587 F.2d

1107, 1118 (D.C.Cir.1978); *Citizens for Rural Preservation*, 648 S.W.2d at 128.

■ If the agency's interpretation of a statute is reasonable and consistent with the language of the statute, it is entitled to considerable deference. *Chemical Mfrs. Assn v. NRDC*, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90, 98 (1985); *Chevron USA v. Natural Res. Def. Council*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694, 702–04 (1984). Deference to the agency action is even more clearly in order when interpretation of its own regulation is at issue. *State of Vermont v. Thomas*, 850 F.2d 99, 102 (2d Cir.1988). We will not convict the trial court of error for determining that the defendants did not violate the law by burning the still bottoms without the usual permits where DNR authorized the practice and there is no scientific evidence in this record that burning of the F003 and F005 still bottoms created a health hazard.

The plaintiffs also argue that the trial court erred in not finding a violation by the defendants when they stored the still bottoms for future use. The plaintiffs argue that DNR "anticipated that the still bottoms would be used as a fuel as they are produced." That argument is without merit.

What DNR "anticipated" the defendants would do with the still bottoms is of no consequence. Unless the still bottoms were moved from the still into the boiler by a direct feed process, some storage was a necessary incident to using that material as fuel. DNR, charged with regulatory responsibility of the Hazardous Waste Management Law, did not condition MRR Inc.'s use of still bottoms as fuel upon a direct feed process. The procurement of hazardous waste permits was not made a prerequisite to MRR Inc.'s operation. Based upon this record, we affirm the trial court's judgment to the extent that it determines that the defendants did not violate the law by storing and disposing of still bottoms during the certification period.

### (b) *Still Bottoms at Facility Site After Certification Expired*

■ We reach a contrary result as to still bottoms stored at the site following expiration of MRR Inc.'s certification. Hostetter testified that the large amounts of still bottoms were on the site when recertification was denied in May 1987 because MRR Inc. had anticipated signing a contract (which did not materialize) to process greater amounts of waste. Accordingly, MRR Inc. had commenced in late 1986 to stockpile still bottoms to use for fuel. In its judgment, the trial court noted that "Section 260.360(19) RSMo 1989 Cum. Supp. defines waste as 'any material for which no use or sale is intended and which will be discarded....'" It then concluded that because the still bottoms had been retained on the premises for a specific use (as a fuel) and were not to be sold, they were not "a waste" regardless of their makeup.

The trial court misapplied the law. Because of the resource recovery exemption, MRR Inc. could lawfully dispose of the still bottoms by using them as fuel. When MRR Inc. engaged in the approved resource recovery process, the still bottoms were intended for an approved use. However, that intended use did not eliminate the characteristics which caused the still bottoms to be hazardous wastes. When MRR Inc. lost its certification and, thus, its right to use the still bottoms for fuel, the firm ceased to have a lawful use for the material which could not be sold. At that point, MRR Inc. became obligated to have hazardous waste and disposal permits. § 260.395.7, RSMo Supp.1981. The defendants admit that MRR Inc. never had the permits. The trial court's judgment was erroneous to the extent that it found that the plaintiffs failed to prove their case against the defendants as to still bottoms on the recovery site after May 5, 1987.

### (c) *Ash and Sludge at Facility Site*

■ Regarding the ash and the sludge in the barrels at the facility site, the plaintiffs argue that MRR Inc. violated the law because these materials are hazardous wastes and MRR Inc. did not have "the permits" required to handle and dispose of them. That argument is without merit for the following reasons.

By its certification documents, DNR set the parameters within which MRR Inc. could operate as a resource recovery facility. It was reasonable for the trial court to infer that when DNR authorized the process it did so knowing that ash would remain after the still bottoms were burned and sludge would remain in the barrels following removal of the solvents. With that knowledge, DNR, by its certification, authorized MRR Inc. to use this process without requiring permits. It was reasonable for the trial court to infer that DNR, by its certification of MRR Inc. without requiring hazardous waste permits, had determined that the ash and sludge were not, as a matter of law, hazardous wastes and that it had exempted MRR Inc. from the requirement that it have permits as part of its policy to encourage resource recovery.

The result is that, under the peculiar facts in this case, DNR has caused to be presented a mixed question of law and fact as to whether the ash and sludge were hazardous wastes. *Wheelabrator Technologies Inc.*, 725 F.Supp. 758; *Better Brite Plating*, 466 N.W.2d at 244.

The foregoing observation is particularly true as to the ash residue from the F003 still bottoms and sludges. The F003 solvents and the still bottoms are hazardous solely because of their ignitability characteristic. If there were evidence in this record that the sludges were hazardous (and there is none), the hazard would obviously arise from the ignitability characteristic. When still bottoms and sludges from F003 solvents are used as part of a fuel mixture, how can the ash continue to be hazardous? Since the possibility of fire and explosion is the health and safety concern for such materials, it defies common sense to suggest that the ash would be ignitable and that the ash would exhibit a flash point so low as to cause it to have the ignitability characteristic.

Despite our careful review of the record, we find no evidence that any testing was

performed at the facility site on the ash, the ground where the ash was placed, or the sludge.[22] We find no testimony by qualified experts establishing that the ash and sludge were hazardous wastes or had the characteristics of hazardous wastes. We have earlier rejected the plaintiffs' argument that the ash and sludge at the facility site were hazardous wastes as a matter of law. We do not find the trial court's determination to be against the weight of the evidence on this issue. We affirm the trial court's judgment to the extent that it determined that the state failed to prove its claims that the defendants violated the Hazardous Waste Management Law by its handling, storing, or disposing of sludge or ash at the MRR Inc. facility.

### B. Failure to Operate Facility According to Certification

#### 1. Lack of Operating Record

The evidence concerning the operating record follows. DNR employee James Kavanaugh testified that on October 23, 1986, he reviewed records at the MRR Inc. site and found no operating record. He noted the absence of an operation record as a violation in his November 12, 1986, "Notice of Violation" form. Contradictory evidence came from Frank Hostetter who testified that MRR Inc. maintained records at two locations, the office in town, where most of the records were stored, and at the facility. He further testified that, while at the office, Kavanaugh asked only for "facility reports" and manifests and did not ask for additional records after they arrived at the facility. Kavanaugh was present at a January 1987 EPA inspection, where an EPA inspector asked for some records, but Kavanaugh did not recall personally examining them.

The plaintiffs had the burden of proof on the factual issue of the alleged non-existence of MRR Inc. operating records. The credibility of witnesses and the weight to be given their testimony is a matter for the trial court, which is free to believe none, part, or all of their testimony. *Herbert v. Harl,* 757 S.W.2d 585, 587 (Mo. banc 1988). Minor contradictions or confusion in the testimony does not require that the evidence be disregarded; the meaning of the testimony is for the trier of fact to decide. *Saunders v. Reorganized School District No. 2 of Osage Cty.,* 520 S.W.2d 29, 37 (Mo.1975); *Farmers and Merchants Ins. Co. v. Harris,* 814 S.W.2d 332, 334 (Mo.App.1991). The trial judge, as trier of fact, may disbelieve testimony even if it is uncontradicted. *Plunkett v. Parkin,* 788 S.W.2d 356, 357 (Mo.App.1990).

We will not disturb the trial court's resolution of the conflicting testimony concerning the existence of an operating record. Under our *Murphy v. Carron* standard of review, we are to affirm the judgment if there is substantial evidence to support it. The record before us contains substantial evidence to support the conclusion that the plaintiffs failed to prove their allegation of a lack of an operating record.

#### 2. Written Quality Control Plan

The plaintiffs charge that defendants failed to have a written quality control plan for their facility in violation of 10 CSR 25–9.010(1)(E)1 (December 1982), which states:

(E) Additional Operating Standards for Certified R1 and R2 facilities:

1. The operator shall follow the quality control plan approved by the department and submitted under subparagraph (1)(C)2.B of this rule.

---

**22.** There was evidence that "samples" were taken at the facility site in 1986 and again in 1989. DNR employees testified about taking the samples, the chain of custody, and testing of the samples. Some records of the testing and analyses were received in evidence. Incredibly, the samples were never identified as being liquids (solvents) or solids (sludge, still bottoms, or soil). Indeed, one technician testified that she could not determine from her "bench sheet" whether the sample tested was liquid or solid. From detailed examination of this record, we have determined that, with one exception, the samples taken at the facility site and later analyzed were liquid samples. The exception was solid material taken from a pond at the facility site (sample no. 89–6409, exhibit 38).

It is at once apparent that DNR misreads 10 CSR 25–9.010(1)(E)1. That regulation requires an R1 or R2 resource facility [23] *to follow* a quality control plan rather than requiring it *to have* the plan as DNR charges.

The regulation which requires certain facilities to have a quality control plan is 10 CSR 25–9.010(1)(C) (December 1982). That regulation requires a R1 or R2 facility to have the plan as a pre-condition to certification. It reads as follows:

(C) Certification Procedures and Conditions. All resource recovery facilities not exempt ... or which accept hazardous wastes from off-site shall be certified. (Comment: This includes those resource recovery facilities which burn hazardous waste as a fuel supplement or substitute).

1. All U facilities which require certification shall complete and submit a Certified Resource Recovery Facility Application Form to the department.

2. In addition to the requirements for a U facility, all R1 and R2 resource recovery facilities must submit the following:

. . . .

B. A quality control plan. . . .

. . . .

3. Upon receipt of a complete application the department shall have sixty (60) days to issue a certificate for operation, or to reject the application for [a] stated cause.

Clearly, a "U" facility is not required to have a quality control plan. *See* 10 CSR 25–9.010(1)(C)1 and (C)2.B. This is significant because this record is devoid of any evidence of the classification assigned to MRR Inc. If it was a "U" facility, no quality control plan was required as a condition of certification and the defendants cannot be fined or enjoined for failure to follow a quality control plan that they were not required to have.

We do not, however, rest our decision solely on the foregoing reading of the regulations. We note that the trial court found that MRR Inc. had attached a quality control plan to its application for certification and "[s]aid certification was issued on two occasions." The plaintiffs claim that finding is erroneous, arguing, "In actuality [MRR Inc.'s] application for certification contained a unilateral explanation of why the waste analysis plan was not required...." We are puzzled by the trial court's findings and we are certainly puzzled by the plaintiffs' argument. MRR Inc.'s 1983 and 1985 applications with purported attachments are not in the record. We do not know what those applications contained.

We do find in the record MRR Inc.'s 1987 application which DNR rejected. Hostetter identified the 1987 application as being identical to the earlier applications except that it called for an increased number of stills and it included a quality control plan. He testified that, as part of the earlier applications (which are not in the record),

---

**23.** Classification of resource recovery facilities as "U", "R1" or "R2" occurred in December 1982 when the DNR promulgated 10 CSR 25–9.010(B). In part, that regulation reads:

(B) Classification of Facilities. Based on the hazardous wastes accepted and the method of management, any resource recovery facility not exempt under subsection (1)(A) of this rule will be certified as a U, R1 or R2 facility. This designation will be made as follows:

1. U—Any off-site facility which accepts hazardous waste for use or reuse directly in an industrial or manufacturing process, without any interim processing or treatment. The hazardous waste must be beneficially used or reused as an ingredient or as a substitute for or supplement to the raw material or feedstock;

2. R1—Any facility which accepts hazardous waste determined to be ignitable (D001), corrosive (D002), reactive (D003), or toxic (D004 through D017), but is not listed in 10 CSR 25–4.010(6)(G) through (L) and is not a sludge. Also any facility which accepts waste oil as defined in 10 CSR 25–4.020; and

3. R2—Any facility which accepts a hazardous waste which is a sludge, or which is listed in 10 CSR 25–4.010(6)(G) through (L).... (Comment: For the purpose of this rule sludge is defined to mean any solid, semisolid, or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility exclusive of the treated effluent from a wastewater treatment plant.)

MRR Inc. had suggested that "a written quality control plan was not necessary and gave the reasons why it wasn't necessary...." We are not favored with an explanation of what those reasons were.

From the above, we cannot convict the trial court of error. First, if the plaintiffs intended to charge that the defendants failed *to follow* a quality control plan in violation of 10 CSR 25–9.010(1)(E)1, they failed to offer evidence on that issue. The only evidence about a quality control plan came from DNR employee James Kavanaugh who testified that there was no written quality control plan available at the facility. The record is devoid of any evidence about whether a quality control plan was being followed. Second, if the plaintiffs intended to charge the defendants with *not having* a quality control plan, the trial court did not err in rejecting that claim.

From this record, the trial court could have inferred that DNR initially classified MRR Inc. as a "U" facility, thereby negating the requirement that MRR Inc. have a quality control plan, or that DNR classified MRR Inc. as an "R1" or "R2" facility and approved its quality control plan as the trial court found, or that DNR accepted the reasons given by MRR Inc. as to why a quality control plan was not required. This follows because DNR did certify MRR Inc. as a resource recovery facility.

If MRR Inc. was an R1 or R2 facility, DNR was required by 10 CSR 25–9.010(1)(C) (December 1982) to approve a quality control plan submitted by MRR Inc. before certification occurred. If no quality control plan was submitted, then DNR must have waived that requirement. Alternatively, DNR classified MRR Inc. as a U facility, and MRR Inc. therefore did not need a plan. The plaintiffs cannot now charge MRR Inc. with failure to have a quality control plan when DNR either did not require the plan for whatever reason or the plan existed but simply was not at the facility site.

The trial court did not err in finding that the plaintiffs failed to prove a quality control plan violation.

### 3. Daily Log of Visual Inspections and Maintenance

Concerning his October 23, 1986, inspection, DNR employee Kavanaugh testified that MRR Inc. had no daily log of visual inspections and maintenance as required by 10 CSR 25–9.010(1)(E)3 (December 1982). Frank Hostetter's testimony contradicted that of Kavanaugh. Hostetter insisted that MRR Inc. had a daily log at the facility but the inspectors never asked for it. He also testified that "[i]f they did [ask], [the daily log] was available to them."

The plaintiffs argue that because Hostetter's credibility was "open to serious question," we should reverse. That totally misconceives the applicable standard of review and our role in reviewing a court-tried case under Rule 73.01(c) and *Murphy v. Carron*, 536 S.W.2d at 32. Applying those familiar standards as we must, we find no error in the trial court's determination that no violation of 10 CSR 25–9.010(1)(E)3 (December 1982) was proven.

Another reason for affirming the judgment on this particular issue exists. Under 10 CSR 25–9.010(1)(E)3 (December 1982) only operators of R1 and R2 facilities must maintain the daily log of visual inspections. As earlier noted, the plaintiffs failed to prove that MRR Inc. was certified as an R1 or R2 facility. If certified as a U facility, MRR Inc. was not required by 10 CSR 25–9.010(1)(E)3 (December 1982) to have the daily log of visual inspections.

### 4. Receipt of Solvents in Violation of Certification

By the pleadings, the plaintiffs alleged, and the defendants admitted, that MRR Inc. was to receive no more than 5,000 gallons of F003 waste and 5,000 gallons of F005 waste per month. We do not understand the allegation or the admission. Certification RR–062 (Appendix "A") clearly authorizes MRR Inc. to receive F003 and F005 solvents in amounts not to exceed 20,000 gallons per month. The trial court obviously looked at the certificate and correctly determined that MRR Inc. was au-

thorized to receive up to 20,000 gallons per month of F003 and F005 solvents. From the record before us, we find no month in which MRR Inc. received F003 and F005 solvents in excess of that limitation. To the extent that the trial court found no violation arising out of this allegation, we affirm.

■ The plaintiffs also charged that MRR Inc. received more than 10,000 gallons of D001 waste in May 1986. By their answer, the defendants admit that allegation. However, once again, the pleadings appear to be in conflict with the evidence. The record shows that in February 1984 (not 1986), MRR Inc. sought permission from DNR to expand its certification so that it could accept waste trichloroethane (TCA, a D001 waste) for recovery. By its proposal, MRR Inc. agreed to comply with the conditions set forth in an EPA letter.

The EPA letter allowed MRR Inc. to receive TCA for recovery without hazardous waste permits but only if there was no storage of TCA at the site. By a February 16, 1984, letter, DNR cautioned MRR Inc. that it was not certified to accept TCA and that before it began to process TCA from any source, it had to amend its "present certification." In a February 23, 1984, letter to MRR Inc., DNR advised that it would not approve amendment of the certification until MRR Inc. had a hazardous waste storage permit. By that letter, DNR specifically told MRR Inc. that, in the absence of the permits, it was "not certified to accept or process any trichloroethane from any source." Later, by its April 6, 1984, letter, DNR recanted its position. In part, that letter reads:

> [I]n an attempt to encourage resource recovery in ... Missouri we will allow your facility to continue accepting the spent trichloroethane from Reynolds Aluminum provided the following conditions are met....

Because the conditions outlined in the letter were more stringent than MRR Inc. was willing to abide by, it never went forward with its plan to receive TCA for recovery.

However, at some point during this TCA recovery application process, MRR Inc. received more than 10,000 gallons of TCA. We find nothing in the record to support a conclusion that DNR authorized MRR Inc. to receive TCA on an interim basis while the certification amendment process was ongoing. We reverse that part of the trial court's judgment which found that the defendants were authorized to accept TCA on a limited basis and which found no violation by the defendants in doing so.

### 5. Failure to Comply with Terms of Certification

■ As part of its Point II argument, the plaintiffs claim that MRR Inc. never complied with the certification terms which required it to "maintain records of all waste analyses conducted, to store all still-bottoms and any products in enclosed tanks and containers and to dike and berm the storage areas to prevent runoff and runon." This assertion is the plaintiffs' argument in its entirety. No facts are recited in the argument portion of the brief which support the foregoing claim, and the argument portion contains no citations to the record where evidence might be found to support the argument.

Equally deficient is the plaintiffs' statement of facts concerning the alleged lack of records regarding waste analyses, the failure to store still bottoms and any products in enclosed tanks and containers, and the failure to dike and berm the storage areas to prevent runoff and run-on. Rule 84.04(c) requires that an appellant's brief include a statement of facts which is "a fair and concise statement of the facts relevant to the questions presented for determination...." It has long been recognized that the primary purpose of the statement of facts is "to afford an immediate, accurate, complete and unbiased understanding of the facts of the case...." *Wipfler v. Basler*, 250 S.W.2d 982, 984 (Mo.1952) (applying predecessor Rule 1.08); *Pioneer Finance Company v. Washington*, 419 S.W.2d 466, 468 (Mo.App.1967) (applying predecessor Rule 83.05); *Porter's Ready-Built, Inc. v. Plummer*, 685 S.W.2d 236,

237 (Mo.App.1985). The plaintiffs' brief does not comply with Rule 84.04(c) and does not satisfy the primary purpose of the statement of facts.

■ "[A]llegations of error ... not properly briefed shall not be considered in any civil appeal...." Rule 84.13(a). Because we are hesitant to rigorously apply Rule 84.13(a), we look to the argument portion of the brief for facts. *See Salamy v. State Farm Fire & Cas. Co.*, 629 S.W.2d 653, 655 (Mo.App.1982). However, as already noted, on these questions we find no facts set forth in the argument. The importance of an accurate recital of the facts in the argument is underscored, where, as here, the plaintiffs fail to comply with Rule 84.04(c). *State ex rel. Hwy. & Tr. Com'n v. Pipkin*, 818 S.W.2d 688, 690 (Mo.App. 1991). We do not expect perfection; however, we do expect reasonable compliance with the briefing rules. *Id.* Because of the complexity of this case and the number of issues raised on appeal, it was imperative that we have an immediate, accurate, complete, and unbiased understanding of the facts relevant to those issues. This we do not find in the plaintiffs' brief as it relates to the foregoing issues.

> [I]t is not the duty of an appellate court to become an advocate for the appellant and search the record for error; the judgment rendered is presumptively correct and the appellant has the burden to demonstrate that it is erroneous. If the court is to adjudicate the appeal without becoming an advocate for the appellant, the appellant must define the scope of the controversy by stating the relevant facts fairly and concisely.

*Thompson v. Thompson*, 786 S.W.2d 891, 892 (Mo.App.1990) (citations omitted). Because of the lack of proper briefing, these issues were not preserved for appellate review. Pursuant to Rule 84.13(a), we affirm without adjudication on the merits. *See Pipkin*, 818 S.W.2d at 690; *Thompson*, 786 S.W.2d at 891.

### 6. Changes in Process without Amending Certification

■ As part of its Point II argument, the plaintiffs assert that the most "serious violations" committed by the defendants were changes made to the facility by MRR Inc. which " '*substantially* [altered] ... a hazardous waste facility without first obtaining a hazardous waste facility permit for such ... alteration from the department' " (emphasis added) in violation of § 260.395.7, RSMo Supp.1981.[24] The violations of § 260.395.7 are said to stem from the fact that MRR Inc. "added two additional stills at the ... facility, constructed and experimented with an activated carbon filter at the facility, constructed a surface impoundment or pond at the site, built additional feed tanks and by-products storage tanks at the site, utilized a separate process for the distillation of hazardous wastes received from Drake Design not provided for anywhere in [MRR Inc's] applications for resource recovery certification and utilized the sludge portion of the hazardous wastes received as an additional fuel source."

While characterizing the changes as "serious violations" in the argument portion of their brief, the plaintiffs' statement of facts does not state, summarize, or cite to evidence in the record supporting or bearing upon this issue. Such briefing practice violates Rule 84.04(c) and affirmance on these questions without adjudication of the merits is warranted. Rule 84.13(a); *Pipkin*, 818 S.W.2d at 690; *Thompson*, 786 S.W.2d at 891.

Again, we hesitate to rigorously apply Rule 84.13(a) and look to the argument portion of the plaintiffs' brief where we find some "facts" which are relevant to the alleged alterations with page citations to the record. However, evidence upon which the plaintiffs rely is simply the observations of DNR personnel about the facility features. No evidence was adduced which tended to establish that what the witnesses

---

**24.** Section 260.395.7 reads, in part: "[I]t shall be unlawful for any person to ... substantially alter or operate ... a hazardous waste facility without first obtaining a hazardous waste facility permit for such ... alteration...."

observed did, in fact, "substantially alter" the hazardous waste facility.

Many of the witnesses who testified for the plaintiffs had experience and expertise with environmental issues. Some witnesses described conditions at the site which the plaintiffs now assert substantially altered the facility. However, not one witness characterized the observed changes in the facility as being "substantial" alterations. No evidence was adduced which might serve as a basis for the trial court to conclude the alterations were "substantial." The plaintiffs cite to no case law, statute, regulation, standard, or guideline which establish what constitutes "substantial" alterations. This court, as was the trial court, is left to speculate about what a "substantial alteration" is.

Apparently, the plaintiffs would have this court declare that the changes of which they complain are "substantial" alterations as a matter of law. This we decline to do. The trial court did not err in declaring that the plaintiffs failed to adduce sufficient evidence to support their allegations on this issue.

The plaintiffs complain that the trial court's judgment "makes no mention of [the] violations of § 260.395.7...." From reading the record, we believe it entirely possible that the trial court was justifiably unaware that the plaintiffs were claiming these changes violated § 260.395.7. To illustrate, following a visit to the facility in May 1985, a DNR employee described the use by MRR Inc. of two stills and the presence at the site of a 2,000 gallon storage tank and a 6,000 gallon storage tank. Yet, the extra still and the extra tanks were not described as being unsatisfactory changes. Similarly, when Kavanaugh inspected the facility in October 1986, he saw that the defendants had put the carbon filtering system together but "had not started to use it." Yet, when Kavanaugh wrote his compliance report he did not list the carbon filtering system as a violation. Such evidence totally undermines the plaintiffs' argument that they viewed the changes in question as substantial.

We affirm the trial court's judgment to the extent that it determined that the above described changes did not violate § 260.395.7.

## C. *Hazardous Waste at the Roscoe Site*

The F003 and F005 solvents were brought to the MRR Inc. facility for processing in 55–gallon barrels. During the distillation process, the barrels were emptied, either by emptying the solvents from the barrels into receiver tanks (F003 waste) or by distilling the liquid directly from the barrels (F005 waste).

After the barrels containing F003 wastes were emptied, the defendants tried to rinse them out. The object was to get the barrels clean enough so that they could be reused for the "clean solvent." However, if a barrel could not be sufficiently cleansed for reuse, the defendants "immediately cut the lid out ... and made a trash barrel out of it." On occasion, sludge did remain in the barrels despite cleaning efforts. For example, Hostetter testified that when the "heads" were cut out of the barrels, the sludge remaining in the barrels would harden or solidify. That material was broken loose with a hammer and was put "back into the auger burner-type thing ... that [MRR Inc.] utilized."

Regarding the F005 barrels, Hostetter testified, "Those ... we didn't try to rinse out. They had polyester, resins, this kind of stuff in it, and you wouldn't have been able to clean it.... We cut the top out of it [F005 barrels], took that remaining material in there, which was ... a gelatin-like mass, and put it over here in the auger and burned it under the still."

Between 10 and 20 of the barrels, which originally contained the hazardous waste materials but had been converted to trash containers, were buried at the Roscoe site. These barrels not only were not sealed, but they had the tops cut out of them. Hostetter testified the drums contained trash, empty paint cans, soft drink bottles, building insulation, wood products, and a coffee maker.

Hostetter also testified that it was "possible" that there may have been some

"sludge" in the barrels, "a minute amount, if any at all." Asked if that sludge "would have been sludges from waste received by [from?] the companies you did business with," Hostetter replied, "It would be a residue contained in an empty container."

When DNR took soil samples at the Roscoe site on August 7, 1986, Hostetter was present. He pointed out to DNR employees the area where the drums had been buried and where to take the soil samples. Five samples were taken from two pits that were dug at the site. Those samples, when analyzed, were found to contain traces of arsenic, barium, cadmium, chromium, and lead.

When the trial court ruled that DNR had not sustained its allegations of violations by MRR Inc. at the Roscoe site, it made the following findings:

10. Tests on samples taken from the site indicate slightly elevated levels of several metals, specifically lead, chromium, cadmium, barium and arsenic, which are hazardous wastes.

11. No evidence was presented to indicate which, if any of these metals would have been present in the residue from the waste materials defendant accepted for processing....

These findings are correct. Inexplicably absent from the record is any evidence of the chemical makeup and characteristics of the sludge that remained in the barrels. Common sense might indicate that when solvents are used to clean paint vats and the spent solvents are hauled away in barrels, heavy materials which settle out of the solvents would contain metals. Common sense, however, is not a substitute for evidence in the record that metals would be in the sludge and what those metals would be.

Likewise, if the still bottoms were suitable for fuel, then common sense would indicate that the sludge would have ignitability characteristics similar to that of the still bottoms because both substances (still bottoms and sludge) are heavy materials left after the liquid is distilled or pumped from the barrels and both substances would be saturated with the solvent.

Again, however, the record is devoid of evidence about the ignitability of the sludge.

What this record lacks is the necessary evidence that linked the sludge residue to the soil sample test results. There is no evidence that the sludge and soil samples had common metal contents. There is no evidence that the sludge had the ignitability characteristic. Evidence that the sludge and the soil samples had common metal content or that the sludge had the ignitability characteristic would have provided the necessary causal link between the sludge residue in the buried barrels and the traces of metals in the soil samples taken from the site where the barrels were interred. However, that necessary evidence is absent from this record.

The defendant's activities at the Roscoe site are indeed highly questionable. Burying trash barrels which formerly contained hazardous wastes and which could not be sufficiently cleaned for reuse to ship recovered solvents scarcely bespeaks an honorable motive. This observation is substantially reinforced by evidence that the defendants began disinterring the barrels under cover of darkness upon learning that DNR was conducting an investigation. However, our suspicion and speculation cannot serve as evidence. Appellate courts cannot "imagine the existence of evidence, when none in fact exists, or supply missing evidence, to flesh out an otherwise insubmissible case, nor can it spring inferences from nowhere upon which to predicate submissibility." *Cato v. Modglin,* 545 S.W.2d 307, 311 (Mo.App.1976), *quoting Wallander v. Hicks,* 526 S.W.2d 848, 850 (Mo.App.1975).

Evidence of the metal content of the sludge residue and its ignitability characteristic was readily available to the plaintiffs, either from their own experts or from employees of Davis Paint and Drake Design. We are at a loss to understand why such evidence was not presented. Evidence that the sludge had metal content or ignitability characteristics in common with the soil samples taken at the burial site would have provided clear evidence of the alleged violation at the Roscoe site. How-

ever, given the lack of any evidence tending to connect the sludge residue to the soil test results at the Roscoe site, we cannot say that the judgment is against the weight of the evidence. We affirm that portion of the trial court judgment which found there was no violation of the Hazardous Waste Management Law at the Roscoe site.

### III. Attorney Fees

 In Point IV, the plaintiffs argue that the trial court erred in ordering them to pay the defendants' attorney fees because, absent a statute explicitly providing for such assessment, such fees cannot be assessed against the state. The plaintiffs rely upon the general rule that costs, including attorney fees, may not be assessed against the state or any of its agencies absent statutory authorization. *Baumli v. Howard County,* 660 S.W.2d 702, 705 (Mo. banc 1983); *Canteen Corp. v. Goldberg,* 592 S.W.2d 754 (Mo. banc 1980); *State ex inf. Ashcroft v. Riley,* 590 S.W.2d 903 (Mo. banc 1979); *Labor's Educational & Political Club v. Danforth,* 561 S.W.2d 339, 350 (Mo. banc 1977); *Automagic Vendors, Inc. v. Morris,* 386 S.W.2d 897, 900 (Mo. banc 1965).

The defendants concede the general rule; however, they claim § 260.415.3, RSMo 1986, provides statutory authorization for the attorney fee award in this case. We reject the defendants' argument for the reasons which follow.

Section 260.415.3 has been referred to by this court as the "citizen suit" provision of Missouri's Hazardous Waste Management Law. *Mertzlufft v. Bunker Resources Recycling,* 760 S.W.2d 592, 601 (Mo.App. 1988). That statute provides, in part:

Any person adversely affected in fact by any violation of sections 260.350 to 260.430 or of any rule or regulation promulgated thereunder may sue for injunctive relief against such violation.

The *prevailing party* in any such action for injunctive relief shall be awarded costs and reasonable attorneys' fees. (Emphasis added.)

Whether § 260.415.3 permits an award of attorney fees in this case need not be decided—and we decline to do so—because the plaintiffs did not seek remedies pursuant to the citizen suit provisions of § 260.415.3. The plaintiffs proceeded, for the most part,[25] under § 260.425,[26] which reads, in part:

In the event ... the department determines that any provision of sections 260.-350 or 260.430 or any standard, rule or regulation, order or determination, or license or permit term or condition adopted or issued hereunder by the ... department ... or any provision which this state is required to enforce under any federal hazardous waste management act, is being, was, or is in imminent danger of being violated, the ... department may, in addition to other remedies under sections 260.350 to 260.430, cause to have instituted a civil action ... for injunctive relief to prevent any such violation or further violation or for the assessment of a civil penalty....

The civil penalties and injunctive relief remedies of § 260.425 can be pursued only by DNR or the Commission acting through the attorney general or a prosecuting attorney by instituting the action in the name of the people of the state of Missouri. The general assembly made no provision in § 260.425 for the award of attorney fees to any party.

The two statutes are clear on the matter of attorney fees; there is no ambiguity and no need for statutory construction. Section 260.415.3 authorizes an award of attorney fees to the prevailing party; § 260.425 extends no such authority to the trial court. The defendants cannot bootstrap themselves into an award of attorney fees based

**25.** The DNR pleaded a common law public nuisance in Count III. No statute authorizes an award of attorney fees under this count. In Count IV, the defendants were charged with the solid waste violation at the Roscoe site. That count was brought pursuant to § 260.240 which does not provide for attorney fees for any party.

Moreover, MRR Inc. was not a prevailing party on Count IV.

**26.** In Counts I, II, V, VI, VII and VIII, DNR specifically alleged that it was proceeding under § 260.425.1.

upon a statute to which they were not subjected. Had the plaintiffs, proceeding under § 260.425, prevailed on all issues, we do not believe they would have been entitled to attorney fees from the defendants.

Neither § 260.415.3 nor § 260.425 authorize an award of attorney fees to the defendants, and we perceive no other basis to sustain the attorney fee award. We reverse the portion of the judgment awarding attorney fees to the defendants.

## IV. DNR's Responsibility for Nuisance at Facility Site

In Point V, the plaintiffs assert that the trial court erred when it found that the public nuisance which existed at the facility site was caused by the plaintiffs' failure to properly administer the law and their "putting [MRR Inc.] out of business without giving it a chance to properly dispose of its accumulated materials." The trial court prefaced that finding with a determination that the still bottoms left on the MRR Inc. site "now poses a hazard to the environment and the public welfare." The record supports the trial court's finding that a public nuisance existed at the facility site at the time of trial.[27] However, based upon this record, the trial court erroneously applied the law in its gratuitous finding that the plaintiffs were responsible.

As a general rule, administrative agencies or officers, when acting in good faith within the scope of their authority, are not civilly liable for the consequences of their acts. 73 C.J.S. *Public Administrative Law and Procedure* § 15 (1983). *See also Feuchter v. City of St. Louis,* 357 Mo. 616, 210 S.W.2d 21, 25 (1948) (public officers are not liable for an error of judgment in line of their official duty and within the scope of their authority, resulting in a wrong decision on questions involving the determination of facts and the application thereto of provisions of law); *State v. Turner,* 328 Mo. 604, 42 S.W.2d 594, 597

(1931); *Industrial Comm'n v. Superior Court,* 5 Ariz.App. 100, 423 P.2d 375, 378–79 (1967); 63A Am.Jur.2d *Public Officers and Employees* § 372 (1984).

Some limited exceptions to this general rule can be found in the field of environmental law, especially when "cleanup" issues are involved and the state agency has been so actively involved in the situation that it can be classified as an "operator" of a hazardous waste site. *See, e.g., Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) (state must share in cleanup costs under federal law where it was "operator" of the site); *Stilloe v. Almy Bros., Inc.,* 759 F.Supp. 95 (N.D.N.Y.1991) (state liable where barrels broke open as they were moving them). These exceptions are limited to those instances where there has been an active, hands-on participation by the agency.

Otherwise, an administrative agency's enforcement of regulatory programs regarding proper operation of a hazardous waste site cannot be a basis for holding the state liable as an operator. *United States v. New Castle County,* 727 F.Supp. 854 (D.Del.1989). No liability arises where the actions taken by the state do not exceed mere regulation and do not constitute active, voluntary, hands-on participation in the day-to-day management and operation of the site. *Id.* at 870. *See United States v. Dart Indust. Inc.,* 847 F.2d 144, 146 (4th Cir.1988); *CPC Intern., Inc. v. Aerojet–General Corp.,* 731 F.Supp. 783, 786 (W.D.Mich.1989).

From this record, it is clear that DNR was not an operator of the facility site.[28] DNR's actions never exceeded regulation and it never involved itself in the day-to-day operation of the site.

Moreover, DNR acted solely in its regulatory capacity when it refused to recertify MRR Inc. MRR Inc. had no vested rights to continued certification. *Bliss,* 702 S.W.2d at 82. *See* 53 C.J.S. *Licenses* § 3

---

**27.** It is unclear from the record whether the facility site has subsequently been cleaned up.

**28.** We decline to decide, and do not intend by these comments to intimate, that the DNR could be an "operator" at any time within the meaning of environmental laws. That is an issue that remains to be decided in Missouri.

(1987); *State v. Seebold*, 192 Mo. 720, 91 S.W. 491 (1905). Whether MRR Inc. should have been recertified was a question for initial consideration by DNR, subject to judicial review. § 260.415.1, RSMo 1986.[29] MRR Inc. chose not to appeal DNR's decision denying recertification. The merits of DNR's decision not to recertify MRR Inc. was not a question before the trial court. The trial court erred in finding that the "nuisance" at the MRR Inc. site was attributable to the plaintiffs.

The judgment of the trial court is reversed to the extent that it declares that DNR caused the conditions that constituted a public nuisance at the MRR Inc. facility and that DNR bears responsibility for cleanup.

## V. Evidence of Facility Site Condition and Cleanup Costs

Point VI deals with matters that might recur on remand. The plaintiffs allege the trial court erred when it rejected evidence concerning current conditions at the MRR Inc. facility and the costs of cleanup. The defendants' objection that such evidence was immaterial and beyond the pleadings was sustained. The plaintiffs' argument is that the evidence was relevant to show the continuing nature of the violations at the site and to provide a basis for the award of civil damages. We agree with the plaintiffs.

Civil penalties are frequently used as a tool to implement a regulatory program. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1942); *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013 (1908); *State ex rel. Brown v. Howard*, 3 Ohio App.3d 189, 444 N.E.2d 469, 471 (1981). The major purpose of a civil penalty is to deter conduct which is contrary to a regulatory scheme. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 231–32, 95 S.Ct. 926, 932, 43 L.Ed.2d 148, 158–59 (1975); *United States v. T & S Brass and Bronze Works, Inc.*,

681 F.Supp. 314, 322 (D.S.C.1988); *United States v. Phelps Dodge Indust. Inc.*, 589 F.Supp. 1340, 1358 (S.D.N.Y.1984); *United States v. Atlantic Richfield Co.*, 429 F.Supp. 830 (E.D.Pa.1977). Encouraging compliance is clearly one of the purposes for civil penalties in environmental cases. *State ex rel. Ashcroft v. Church*, 664 S.W.2d 586, 589 (Mo.App.1984).

The relevant factors to be considered in assessing civil penalties are not set out in the Hazardous Waste Management Law or in Missouri case law. Looking to other jurisdictions, we find the following factors frequently mentioned: (a) defendant's good or bad faith, *United States v. Papercraft Corp.* 540 F.2d 131 (3d Cir.1976); *United States v. J.B. Williams Co.*, 498 F.2d 414, 24 A.L.R.Fed. 471 (2d Cir.1974); *United States v. Swingline, Inc.*, 371 F.Supp. 37, 47 (E.D.N.Y.1974); (b) the financial gain which accrued to defendant, *ITT Continental Baking Co.*, 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148; *Papercraft*, 540 F.2d 131; *Swingline*, 371 F.Supp. at 47; (c) the environmental harm caused by the violations, *Papercraft*, 540 F.2d 131; *Swingline, Inc.*, 371 F.Supp. at 47; and (d) the seriousness of the violation, *T & S Brass and Bronze Works*, 681 F.Supp. at 322. *See generally Howard*, 444 N.E.2d at 471.

In the absence of legislative direction to the contrary, an action to recover a penalty is governed by the same rules of evidence that apply to ordinary civil actions. 70 C.J.S. *Penalties* § 19 (1987). If testimony is logically relevant, it should be admitted unless forbidden by some of the exclusionary rules. *State v. Burnett*, 429 S.W.2d 239, 245 (Mo.1968); *State v. Knight*, 356 Mo. 1233, 206 S.W.2d 330 (Mo. 1947); *Godsy v. Thompson*, 352 Mo. 681, 179 S.W.2d 44, 49 (Mo.1944); *McFadden v. McFadden*, 509 S.W.2d 795, 799 (Mo.App. 1974). The test for relevance is whether an offered fact tends to prove or disprove a fact in issue or corroborates other relevant evidence which bears on the principal issue. *Charles F. Curry and Co. v. Hedrick*, 378

---

**29.** Section 260.415.1, reads, in part: "All final orders and determinations of the commission or the department made pursuant to the provisions of sections 260.350 to 260.430 are subject to judicial review pursuant to ... chapter 536, RSMo...."

S.W.2d 522, 536 (Mo.1964); *Guthrie v. Missouri Methodist Hosp.*, 706 S.W.2d 938, 941 (Mo.App.1986); *Lawson v. Schumacher & Blum Chevrolet Inc.*, 687 S.W.2d 947, 951, 64 A.L.R.4th 109 (Mo.App.1985). The relevance threshold is satisfied when the truth of the offered fact makes probable the existence of the fact in issue. *Carlyle v. Lai*, 783 S.W.2d 925, 928 (Mo.App.1989); *Lawson*, 687 S.W.2d at 951.

Mindful that a trial court is granted broad discretion in admitting or rejecting evidence on relevance grounds, we find that the trial court abused its discretion. Principal issues in this case include whether the defendants violated the law so as to subject them to civil penalties and how much penalty should be imposed. DNR's offer of proof included specific facts about the MRR Inc. site at the time of trial and specific facts about the cost incurred by Davis and Drake to remove some of the hazardous materials. That evidence, if believed, makes probable the existence of the fact issues in this case, i.e., that the defendants violated the law and that civil penalties should be imposed. This follows because the proffered evidence tended to show the environmental harm caused by the violations, the financial gain accruing to MRR Inc. when it did not clean up the site, and the seriousness of the violation.

We conclude that evidence of the site condition and evidence of cleanup costs were relevant and admissible. We also conclude that such evidence was not beyond the scope of the pleadings, especially Count VIII in which DNR asked the trial court to order the defendants to clean up the site and to submit an adequate closure plan. Such mandatory relief was obviously not necessary if the site was clean and adequate closure had occurred prior to trial. Evidence tending to show the continued need for the mandatory relief is not beyond the scope of that pleading. The trial court should have admitted the evidence.

VI. Refusal to Admit "Bench Records" into Evidence

In Point VII, the plaintiffs complain that the trial court erred when it refused to admit exhibit 42 under the business record exception to the hearsay rule. *See* § 490.680, RSMo 1986. This issue also might arise following remand.

Exhibit 42 was described as "bench sheets." It consisted of forms used by laboratory technicians to record sample types, the type of analysis made, the instruments used, and the instrument readings. When the trial court refused to admit exhibit 42, DNR called as witnesses each technician who recorded the test results. We quote from the plaintiffs' brief: "[DNR] was prejudiced by the court's ruling of the inadmissibility of the business records ... in that [DNR] was then required to call to the stand each analyst who recorded test results from the scientific devices used in the case." The plaintiffs do not point to any evidence they sought to admit by exhibit 42 which was not ultimately admitted when each technician was called as a witness. Point VII has no merit.

We affirm the judgment of the trial court with the following exceptions. We reverse that part of the judgment which awarded attorney fees to the defendants, declared that DNR caused the conditions that constitute a public nuisance at the MRR Inc. facility site, and declared that DNR had the obligation to abate the nuisance at the MRR Inc. site. We reverse the trial court's declaration that Frank Hostetter has no personal liability for the actions of MRR Inc. As to both defendants, we reverse and remand for further proceedings regarding the allegations in Counts II, III, and VIII to the extent those allegations pertain to still bottoms and liquids having the characteristic of ignitability stored or handled at the MRR Inc. facility site after May 5, 1987, and the allegations in Count V to the extent they, and the relief sought, pertain to the defendants' accepting trichloroethane at the facility site.

MONTGOMERY, J., concurs.

MAUS, J., concurs in part and dissents in part in separate opinion.

## APPENDIX A

April 18, 33

PLAINTIFF'S EXHIBIT

Mr. Frank "Pete" Hostetter
P.O. Box 133
Osceola, Missouri 64776

Case No. 17271-2

RE: Resource Recovery Certification — RR-062

Dear Mr. Hostetter:

This letter is to inform you that the department has completed the review of your certified resource recovery facility application form. After a review of your application form and the supporting documents the department is pleased to inform you that the Resource Recovery Company located in St. Clair County has been certified for resource recovery contingent upon the following provisions:

1. The operator shall comply with 10 CSR 25-9.010.

2. The operator shall accept for reuse only those waste listed below and in quantities not to exceed 20,000 gallons per month.

 Ethanol (Ethyl Alcohol) Isobutyl Alcohol
 Acetone Methanol (Methyl Alcohol)
 Ethyl Ether Methyl Ethyl Ketone
 N. Butyl Alcohol Pyridine
 Ethyl Acetate

 The operator is limited to these wastes because the still bottoms are intended to be used as fuel for the boiler. The above list is for major components (in the percentage range), miscellaneous contaminants listed in the application (less than 1000 ppm) will also be allowed. At a future time with proper management other wastes may be approved on a case-by-case basis.

3. The operator shall maintain records of all still bottoms and when they were burned as fuel supplement. The operator shall also retain records of waste analysis. The records shall be maintained in accordance with 10 CSR 25-7.011(6)(B).

4. Storage of wastes received, still bottoms and product shall be in closed tanks and containers and the storage area shall be diked and bermed to prevent run off and run on.

5. The condenser water discharge shall be in compliance with the water pollution control laws and rules of this state. Please contact Mr. Greg Perkins of the Springfield Regional Office at (417) 883-4033 to assure compliance.

<div align="center">EXHIBIT A</div>

<div style="margin-left:0">

**MISSOURI DEPARTMENT OF NATURAL RESOURCES**
P.O. Box 1368 1915 Southridge Drive Jefferson City, Missouri 65102 (314) 751-3241

</div>

Christopher S. Bond Governor
Fred A. Lafser Director

Division of Environmental Quality
Robert J. Schreiber Jr., P.E. Director

Mr. Hostetter
Page 2
April 18, 1983

 6. The emission to the air shall be in compliance with air pollution
 control laws and rules of this state. Please contact Mr. Mike
 Price at 314-751-4817 to assure compliance.

If you have any questions regarding compliance with your certification,
please contact me at this office.

Sincerely,

Joe Jansen
Environmental Engineer
Technical Services Section
Waste Management Program

JJ:gh

Enclosure

cc: Mr. Bob Stewart, EPA
 Springfield Regional Office
 Mr. Mike Price, APCP
 Mr. Greg Perkins, Springfield Regional Office

APPENDIX B

PLAINTIFF'S EXHIBIT
57
Case No. 17271-2

May 3, 1985

Mr. Frank E. Hostetter
Missouri Resource Recovery, Inc.
P. O. Box 152
Osceola, Missouri 64776

RE: Resource Recovery Certification RR-062
 Classification - R2

Dear Mr. Hostetter:

The letter is to inform you that the department has completed the review of your certified resource recovery facility application form. After a review of your application form and the supporting documents the department is pleased to inform you that Missouri Resource Recovery, Inc. has been certified for resource recovery contingent upon the following provisions.

1. The operator shall comply with 10 CSR 25-9.010.

2. The operator shall accept only those wastes classified as F003 and F005 and in the amounts specified in the application. The operator is limited to these wastes because of the potential hazard to the environment with any mishandling or improper storage of F001 and F002 wastes. To accept F001 and F002 wastes for reclaim the operator must first obtain a storage permit through the MDNR and USEPA.

If you have any questions regarding compliance with your certification, please contact me at (314) 751-3241 or by writing to P. O. Box 1368, Jefferson City, Missouri 65102.

Sincerely,

Nancy Grice McGowan
Environmental Engineer
Permits Section
Waste Management Program

NGM:lh

Enclosure

cc: Mr. Bob Stewart, EPA, Region VII
 Springfield Regional Office

**MISSOURI DEPARTMENT OF NATURAL RESOURCES** P.O. Box 1368 Jefferson City, Missouri 65102

**John D. Ashcroft** Governor

---

MAUS, Judge, concurring in part and dissenting in part.

I concur in reversing parts of the judgment of the trial court as set forth in the majority opinion. I also concur in the reversal of the judgment of the trial court relating to Counts II, III and VIII of the amended petition. I would, however, as

hereafter indicated, on those counts direct that upon remand the trial court enter appropriate orders of enforcement and fines. I would reverse the judgment of the trial court on Counts I and IV and remand those counts for the entry of findings in favor of DNR and appropriate orders of enforcement and fines. Except to the extent hereafter expressed, I concur in the balance of the majority opinion. I do so with the following observations.

This appeal presents a voluminous transcript and legal file. The numerous exhibits are detailed and complex. This record alone makes a statement of the case, so well done in the majority opinion, a most difficult task. A resume of the controlling legal background presents an even more onerous undertaking. As noted, the background consists of federal and state statutes and regulations. The federal regulations present a tangle of words virtually impenetrable to a rational understanding of their meaning. The state regulations, which are of the same ilk, incorporate many of the federal regulations. As a result, the applicable regulations stand as a monument of obfuscation. The majority opinion has incredibly well summarized the applicable law.

By Counts I and IV, DNR sought to establish defendants violated applicable regulations by burying between 10 and 20 used barrels at the Roscoe site. Five soil samples were taken from the pits where the barrels were buried. Four of those samples were found to contain arsenic, barium, cadmium, chromium and lead. There was no evidence those metals were found in the hazardous wastes defendants were processing. The trial court noted this deficiency but cryptically added, "the total amount of hazardous waste at the Roscoe site is insignificant." It denied Count I and under Count IV found defendants buried solid wastes (distinguished from hazardous wastes) on the Roscoe site in violation of § 260.210(1) and imposed a $500 fine upon defendant MRR Inc. In all other respects it denied Count IV.

The contradictory and incomplete findings of the trial court do not establish defendants did not violate the regulations by burying hazardous wastes at the Roscoe site. Defendants were processing wastes listed as hazardous wastes under categories F003 and F005. The applicable regulation specifically declares the "still-bottoms from recovery of these solvents" to be hazardous wastes. 40 CFR § 261.31. The sludge in the bottom of the barrels would have been a concentration of the waste declared to be hazardous. Cf. *U.S. v. Baytank (Houston), Inc.*, 934 F.2d 599 (5th Cir.1991). Regulations provide "[a] hazardous waste will remain a hazardous waste" until it "meets the criteria of paragraph (d)". 40 CFR § 261.3(c)(1). Neither the still bottoms nor the sludge meets that criteria.

Further, defendant Hostetter testified that not only still bottoms, but also sludge from F003 waste and the solid residue from F005 waste contained in the barrels were used as fuel. The still bottoms, sludge and solid residue, which were used as fuel, had the characteristic of ignitability. That characteristic causes a waste, even if not listed, to be a hazardous waste. 40 CFR § 261.20. The soil taken from the pits where the barrels were buried was ignitable. The fact defendant Hostetter, upon learning an investigation of the Roscoe site was imminent, attempted to remove the barrels in the "dead of night" strengthens the logical inference the barrels did contain a significant amount of ignitable, hazardous wastes. The failure of the trial court to find the defendants violated the regulations by their actions at the Roscoe site is not supported by the evidence and is against undisputed evidence. It misapplies the law under that evidence. I must conclude the undisputed evidence establishes defendants buried barrels containing a sufficient amount of hazardous waste to percolate into the soil and cause it to be ignitable. Cf. *United States v. Conservation Chemical Co.*, 619 F.Supp. 162 (D.C.Mo. 1985). I would find the defendants did violate the regulations by burying hazardous wastes at the Roscoe site and reverse the judgment of the trial court upon Counts I and IV. I would direct that upon remand the trial court enter appropriate orders to enforce the applicable regulations and impose appropriate fines.

By Counts II, III and VIII, DNR sought to establish the defendants improperly stored hazardous wastes at the resource recovery site. The letters of resource recovery certification by DNR, expressly contingent upon MRR Inc's compliance with 10 CSR 25–9.010, do not establish MRR Inc. had not and would not store hazard wastes in contravention of the regulations. Defendants accumulated 600 barrels of ignitable material at that site. According to Hostetter that material consisted of still bottoms and sludge. This accumulation was not "[s]torage of hazardous waste ... prior to resource recovery." See 10 CSR 25–9.020(3)(E)8 and its predecessors. It was hazardous waste generated by MRR Inc. It may be the regulations governing resource recovery did not prohibit the accumulation of still bottoms to the extent necessary to permit the same to be used as fuel. But, I would hold the accumulation of 600 barrels of still bottoms and sludge for a future use as fuel, which use never materialized, exceeded the amount and was beyond the purpose permitted as a part of resource recovery. Compliance with that portion of 10 CSR 25–9.010 pertaining to storage and other regulations applicable to storage was required. See 40 CFR § 261.-5(f), incorporated into 10 CSR 25–4.261 and its predecessors.[1] The provisions of the regulations applicable to storage by all generators of hazardous waste were applicable. See 40 CFR § 261 and additional regulations incorporated therein. Suffice it to say the evidence establishes the defendants' storage of hazardous wastes did not meet the standards of those regulations.

The judgment of the trial court on Counts II, III and VIII is against the weight of the evidence and misapplies the law under the undisputed evidence. I would reverse the judgment of the trial court upon those counts and direct that upon remand appropriate orders of enforcement and fines be entered.

---

1. The relevant Missouri regulation has, upon incorporation in a revised regulation effective in 1990, been amended to be specifically applicable to the storage of still bottoms. The balance substantially follows its predecessor. It reads as follows:

"8. Storage of hazardous waste as defined in 10 CSR 25–4.261, prior to resource recovery, does not require a permit or interim status pursuant to 10 CSR 25–7 if the following conditions are met:

A. Interim status or a permit for this storage is not required under 40 CFR Part 270 as incorporated in 10 CSR 25–7.270;

B. Still bottoms produced from resource recovery processes may be stored in accordance with the satellite accumulation provisions of 10 CSR 25–5.262(2)(C)3. until necessary to move to a storage area prior to shipment and/or disposal. Once satellite accumulation ends, the facility has ninety (90) days to ship and/or dispose of the still bottoms, irrespective of any accumulation times of the waste solvents prior to reclamation; and

C. Storage of hazardous waste shall be in compliance with 10 CSR 25–5—10 CSR 25–11.010. (Note: Underground storage tanks may need to meet additional requirements (that is, 40 CFR Part 280) as directed by the United States Environmental Protection Agency (U.S. EPA) and MDNR Water Pollution Control Program.)." 10 CSR 25–9.020.